UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEW MEXICO

In re:
JOE BETTENCOURT BORGES,
dba J&M Dairy,
    Debtor.                            No. 11-10-12800-s11

AG NEW MEXICO, FCS, ACA,
AG NEW MEXICO, FCS, PCA,
AG NEW MEXICO, FCS, FLCA,
    Plaintiffs,
v.                             Adv. No. 10-1170-s

Joe Bettencourt Borges, aka Joe Borges,
aka Joe B. Borges;
Maria Rocha Borges,aka Maria Borges,
aka Maria R. Borges;
David Borges, a married man,
 dealing in his sole and separate estate;
Frank Borges, a single man;
Atkins Engineering Associates, Inc., a New Mexico Corporation;
Cliff Waide;
Alvin F Jones dba Waide Irrigation Service and Supply;
Internal Revenue Service,
 an agency of the United States of America;
Pecos Valley Pump, Inc., a New Mexico Corporation;
Jordan Dairy Service, LLC, a New Mexico Corporation;
CWBC, Inc., a New Mexico Corporation; and
All Unknown Claimants of Interest, In The Premises Adverse To The
Plaintiffs;
    Defendants.

Joe Bettencourt Borges and
Maria Rocha Borges,
    Plaintiffs,

v.                             Adv. No. 11-1012-s
                             consolidated with
                             Adv. No. 10-1170-s
AG NEW MEXICO, FCS, PCA,
AG NEW MEXICO, FCS, ACA, and
AG NEW MEXICO, FCS, FLCA,
    Defendants.

Case 10-01170-nlj   Doc 182   Filed 12/31/12   Entered 12/31/12 19:36:25 Page 1 of 109

JOE BETTENCOURT BORGES and
MARIA ROCHA BORGES,
        Plaintiffs,
v.                                              Adv. No. 11-1105-s
NATIONAL MILK PRODUCERS
FEDERATION dba Cooperatives Working
Together; AG NEW MEXICO FCS, ACA,
AG NEW MEXICO, FCS, FLCA, and
AG NEW MEXICO, FCS, PCA
        Defendants.


## MEMORANDUM OPINION AFTER TRIAL ON THE MERITS IN SUPPORT OF JUDGMENT AND AWARD OF RELATED RELIEF

This matter came before the Court for trial on the merits of the claims of AG NEW MEXICO, FCS, ACA ("ACA"), AG NEW MEXICO, FCS, PCA ("PCA"), and AG NEW MEXICO, FCS, FLCA ("FLCA") (collectively "Plaintiffs" or "AGNM") against Joe Bettencourt Borges ("Mr. Borges") and Maria Rocha Borges ("Ms. Borges") (collectively "Borges'" or "Debtors") and Debtors' Counter-claims against the Plaintiffs. For the reasons set out below, the Court will grant judgment and other relief in part to AGNM and to the Debtors, and will remand Adversary Proceeding 10-1170 to the state court from whence it was removed.[1]

---

[1] The Court has subject matter and personal jurisdiction pursuant to 28 U.S.C. §§1334 and 157(b); this is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(B), (C), (E), (H) and (K); and these are findings of fact and conclusions of law as may be required by Rule 7052 F.R.B.P. The parties, including Plaintiffs, have consented to this Court hearing and finally deciding the issues by virtue of the Stipulated Order (main case, doc 128, ¶6).

Case 10-01170-nlj   Doc 182   Filed 12/31/12   Entered 12/31/12 19:36:25 Page 2 of 109

**Procedural Background and Pleadings**

Debtors filed a joint chapter 11 petition for themselves dba J & M Dairy. Case no. 10-12800. Maria Borges was dismissed from the case without prejudice for failing to obtain the requisite prepetition credit counseling. Main case, doc 92. She promptly filed another chapter 11 case, no. 10-14903, which was quickly substantively consolidated with the earlier filed no. 10-12800. Doc 113.

AGNM had filed a complaint for money due and for foreclosure against Borges and others (none of the latter, except Frank and David Borges, remain in the action), seeking to collect proceeds from the liquidation of the Borges' dairy herd and to collect on other collateral, and to foreclose on and sell a dairy facility and an adjacent farm. The action was filed in the Fifth Judicial District Court, County of Eddy, State of New Mexico (CV-09-610) ("State Court Action") on August 28, 2009. Debtors had answered and raised affirmative defenses and counterclaims against AGNM. Id. Debtors removed the State Court Action to this Court. Adversary Proceeding No. ("AP") 10-1170. Debtors filed an adversary proceeding against AGNM, seeking avoidance of AGNM's liens and turnover of the proceeds in the Court registry. AP 11-1012. Debtors also filed an adversary proceeding against AGNM and the National Milk Producers Federation dba Cooperatives

Working Together[2], seeking turnover of the proceeds from the sale
of the Borges' dairy herd which resulted in, among other things,
the deposit into the registry of this Court of those proceeds in
the sum of slightly over $4 million.  AP 11-1105.[3]

AGNM filed proofs of claims in the main case – nos. 15, 16
and 17 – to which Debtors objected (coincidentally docs 115, 116
and 117 respectively).  The parties then usefully entered into
stipulations that Plaintiff's claims and Debtors' affirmative
defenses and counterclaims, set out in AP 10-1170, would be
deemed to have been asserted fully in the chapter 11 case and AP
11-1012 as if fully set forth therein, without the need to file
them again in the case or the adversary proceeding.  Main Case,
doc 127; AP 11-1012, doc 4.  Thus the primary claims, affirmative
defenses and counterclaims[4] are sufficiently arrayed as pleadings

---

[2] Resulting in a delightfully appropriate and probably not
altogether serendipitous acronym of "CWT."

[3] Debtors' complaint in AP 11-1105 also sought damages
against AGNM for alleged violations of the automatic stay in
refusing to cooperate in the deposit into the registry of the
court of the sales proceeds.  Doc 1.  Paragraph 16 of the
complaint recited that "Debtors have been damaged by the
violations of the automatic stay in various ways, to be proven at
trial."  Helpfully for all concerned, no such proof was presented
at trial, which would have been denied in any event, partly in
light of the disposition of this matter.

[4] In AP 11-1105, AGNM counterclaimed against Debtors that
they had converted some of AGNM's collateral from the property.
Debtors denied that the personal property taken was covered by
AGNM's security agreement.  This controversy is addressed below

in each proceeding for trial purposes.[5]

On September 6, 2011, the Court entered its memorandum opinion (doc 78) and order (doc 79) in AP 10-1170, granting partial summary judgment to Plaintiffs that all three plaintiffs hold a security interest in the funds in the registry of the Court and that PCA has a perfected secured claim in the funds. However, the Court declined to award the registry funds to AGNM because the issue of whether AGNM was owed anything at all was not and could not be decided by the summary judgment. In consequence, the $4 million remains in the registry of the Court in connection with AP 11-1105. Several additional motions for summary judgment were filed by the parties (AP 10-1170 docs 53, 55, 57 and 129), but the Court entered an order deferring ruling on those motions (doc 132). Thereafter the trial on the merits commenced May 21, 2012, with the presentation of evidence concluding on May 31. Closing arguments in the form of briefing concluded on July 16, 2012, at which time the matter was submitted.

As noted, in the State Court Action, and now in AP 10-1170 and the other proceedings, AGNM seeks a judgment establishing the

_____

but the Court does not consider the dispute to be part of the "primary claims" addressed in this memorandum opinion.

[5] These pleadings, particularly the affirmative defenses and counterclaims, are set out in more detail below.

debts owed to it and permitting it to foreclose or otherwise collect on its collateral. The collateral includes, according to the complaint, the proceeds of the bid which CWT accepted to take the dairy herd out of production[6] – about $4 million, the dairy facility and adjacent farmland (and water rights) mortgaged or pledged to AGNM, and proceeds of milk sales. AGNM is also claiming (1) the right to approximately $360,000 held by it as "cash collateral," received by it from sales of cattle and receipt of $90,000 of milk proceeds, and put into a "Funds Held" account and not yet applied to reduce the amount owed on any of the notes, and (2) application of $1,000 of FLCA stock to repay the debt owed to it.

In response, Borges' deny many of the allegations of the complaint (mostly for lack of information and belief). AP 10-1170, doc 5, at 1-7. Borges' also raise affirmative defenses of unclean hands, failure to mitigate damages, waiver and estoppel, breach of good faith and fair dealing, breach of contract, duress, voluntary payment or tender of payment, offset, accord and satisfaction, Plaintiffs' settlement of claims with Dairy

---

[6] The proceeds of the sale as such of the herd – that is, what the packing house paid upon the receipt of the cattle – were paid to AGNM. As explained in more detail below, a separate fund was generated when CWT paid the Borges' to get out of the dairy business; it is these funds that are part of the dispute between the parties.

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 6 of 109

Farmers of America, promissory estoppel and failure to state a claim upon which relief can be granted.  Id. at 7-8.  And finally Borges' assert counterclaims of breach of contract, breach of obligation of good faith and fair dealing, promissory estoppel, interference with Devine contract, interference with CWT contract, interference with Lewis contract, conversion of CWT proceeds, conversion of payments, violation of the (New Mexico) Unfair Practices Act, and prima facie tort.  Id. at 8-29.  AGNM answered the counterclaims, denying liability and asserting affirmative defenses that were much the same as the affirmative defenses and counterclaims asserted by Borges' against AGNM.  Doc 6.

On May 21, 2012, the Court commenced an eight-day trial on the merits of the claims and counterclaims.  The parties then submitted simultaneous closing arguments and responses to the closing arguments in writing.  Docs 168 ("Borges Closing"), 169 ("AGNM Closing"), 180 ("AGNM Reply"), and 181 ("Borges Reply").[7]

**Factual Background**

Plaintiffs are federally chartered agricultural lenders.  PCA (Production Credit Association) and FLCA (formerly

---

[7] The Court expresses its appreciation to both sides for the detailed and precise presentations of their respective positions in their closings.

the Federal Land Bank) are wholly owned subsidiaries of ACA (Agricultural Credit Association).  ACA is under the supervision of Farm Credit Bank of Texas ("FCBT"), headquartered in Austin, Texas.

Joe and Maria Borges were dairy farmers for decades, first in California and then in New Mexico.  In 2006, the Borges' dba J & M Dairy in Artesia, New Mexico began dealing with AGNM.

On June 6, 2006, the Borges' dba J & M Dairy signed a promissory note to PCA – loan no. 216100056 (variously "Note 56", "Cow Note", "Operating Note", or "[Revolving] Line of Credit Note") – for a line of credit in the original principal amount of $4,750,000.  AGNM exhibit A ("Ex. A").  That note was renewed by a note dated and signed July 13, 2007 in the amount of $5,575,000.  Ex. B.  That note in turn was renewed by a note dated and signed May 29, 2008 in the amount of $6,100,000.  Ex. C.  Loan 56 was continuously directly collateralized by over 7,000 cattle (mostly dairy cattle, plus their offspring and bulls), including any replacements, as well as by, among other things, all milk and milk proceeds, all crops including hay and other feed, the farm equipment and any accounts receivable. Commercial Security Agreement, dated June 6, 2006.  Ex. G.  The Borges' executed renewal security agreements on July 13, 2007, Ex. H, and May 29, 2008.  Ex. I.  The security agreements were

perfected by filing a financing statement with the Secretary of State. Ex. J-1. Repayment of Note 56 was also collateralized by a Line of Credit Mortgage dated June 6, 2006 ("2006 Mortgage"). Ex. 15.[8]

On August 17, 2006 Borges' signed a single advance promissory note to PCA – loan no. 216100060 (variously "Note 60", "Equipment Note" or "ITL Note") – in the original principal amount of $101,788.75 for the purchase of dairy equipment. Ex. L. Repayment of that note was also secured by Exs. G, H and I, and the lien perfected by a filing with the New Mexico Secretary of State, Ex. J-2, and the Eddy County Clerk. Ex. K.

Also on June 6, 2006, the Borges' signed a promissory note

---

[8] The 2006 Mortgage was included in AGNM's exhibits as Ex. R and in Debtors' exhibits as Ex. 15. The parties usefully agreed that Ex. 15 would be admitted into evidence, thereby obviating the need to admit Ex. R. The same procedure occurred in connection with the so-called Corrected Mortgage entered into the Eddy County real estate records on March 13, 2009: Ex. 102 was admitted in lieu of Ex. S. All four copies of the respective exhibits were certified as accurate and true by the Eddy County Clerk's office. In its closing arguments AGNM referred to Exs. R and S. Obviously it should have referred to Exs. 15 and 102 respectively instead. The Borges Reply, at page 8 n. 5, notes the error by stating that "AGNM improperly relies on AGNM Ex R which was not admitted into evidence." It makes the same statement concerning Ex. S at page 8 n. 6. In neither footnote is there a further reference to the admission instead of Exs. 15 and 102. Obviously the references to Ex. R and S constitute a situation of "no harm, no foul", so the Court is left wondering if there was some further point that Debtor was making in the footnotes.

to FLCA – loan no. 860090 (variously "Note 90", "Facility Note", "Real Estate Note") – in the original principal amount of $3,126,177. Ex. O. Repayment of Note 90 was secured by the June 6, 2006 mortgage. Ex. 15. The legal description attached to Ex. 15 covered much of the land owned by Borges'.[9] Borges' also assigned water rights as collateral. Exs. 8-13. Prior to executing the notes and obtaining the mortgage, AGNM had obtained an appraisal dated May 18, 2006. Ex. W. The appraisal valued the J & B Dairy and the 557.33 acres of land and improvements, effective April 17, 2006, at $4,450,000.

The core of the funding arrangement was the continual production of milk, enabled by advances on Note 56 for feed, payroll, utilities, etc., which advances were in turn paid down by the proceeds of the sales of the milk. Borges' sold their milk to the Dairy Farmers of America ("DFA") who twice a month sent a check jointly payable to Borges' and AGNM, which AGNM applied to the loans. These "milk checks" were applied first to

_____

[9] The details of what exactly this version (Ex. 15) of the mortgage and a subsequent version of the mortgage (Ex. 102) covered are addressed in more detail later in the opinion. However, the Court makes clear now that it disagrees with Debtors' position that because the 2009 mortgage was the basis of the foreclosure action, because the Court rules that it is invalid, AGNM may not rely on the 2006 mortgage. In fact the 2006 mortgage was admitted into evidence and repeatedly referred to, and the Court deems that the 2006 mortgage is part of AGNM's trial presentation.

make the monthly mortgage payment (Note 90), then the monthly payment on Note 60, then expenses and interest on Note 56, and finally to pay down principal on Note 56. The milk checks arrived every two weeks or so, and usually averaged $200,000 to $400,000. The checks were the primary cash flow of the entire dairy operation and the life blood of the arrangement with AGNM that funded the operation. With a total herd exceeding 7,000 milking cows, heifers, bulls and bull calves, the J & M Dairy was one of the largest in the state. In consequence, the receipt on a regular basis of "good sized"[10] milk checks was extremely important to AGNM.

During the first part of the decade, milk prices steadily rose as millions of people across the globe accumulated wealth and moved into the middle class, thereby creating heightened demand for dairy protein and causing milk prices to rise. However, with the worldwide financial crisis that caused millions of people to lose wealth and drop back out of the middle class, the demand for dairy protein fell off, causing a significant reduction in milk prices in the United States. That decline naturally adversely affected the economics of many dairies, including the J & B Dairy, causing a drop in value of dairies in

---

[10] The description is Mr. Moorman's.

general and dairy cattle herds.  By 2008, the J & B Dairy was
losing money, as was the case for most of the other eleven
dairies that were AGNM's clients.

PCA began seeking more collateral from the Borges' or
alternatively the relationship moving to another financial
institution, due at least in part to its major exposure from a
number of dairy related loans.  At some point during this period
Maria Borges decided to get out of the dairy business, and she
communicated that thought to AGNM.  AGNM claims that message was
communicated in 2007; Debtors claim it was in 2008.  Regardless,
no later than the middle to end of 2008, both Borges' and AGNM
were expecting the sale of the herd and the end of the dairy
operation by Borges'.  Ex. 28 (November 3, 2008 e-mail from FCB
Texas to AGNM approving additional lending to Borges' but
requiring downgrade in risk rating from "9A" to "11A" due to
operating losses sustained by dairy and to Ms. Borges' decision
to cease the dairy operations).[11]  Ms. Borges sought to maximize

_____

[11] According to Mr. Yoakum, following receipt of the
November 3 e-mail, AGNM downgraded the Borges' loans from "9" to
the substandard "11A" rating on November 30, 2008.  Ex. 175 is a
collection of monthly forms for tracking loans with risk ratings
of 9 through 12, for March 31 through July 31, 2009.  In each
report the Borges loans are rated "11".  The March report recites
that the payments are current on each loan, but by July the
report says that AGNM is awaiting payment of the DFA funds from
the state court (more on that below), is awaiting payment of the
CWT funds, and has given the Borges' a deadline of August 12,

the return to her and her husband of any equity in the dairy
operation, including the cattle particularly, so that she could
pay the outstanding dairy bills and continue making both the
mortgage payments on the farm and the payments due on the real
estate contract for the purchase of the Smith Farm.  Ms. Borges
wanted to sell the dairy facility on a real estate contract and
to continue to operate two (unrelated) farms she was purchasing
on real estate contracts, thus providing a source of income to
pay the FLCA loan and to support herself and her husband.[12]  Ex.
25 (Oct 23, 2008 e-mails between Ms. Moncrief and Mr. Logsdon).
Everyone was assuming that the dairy herd would sell for a
sufficient sum to pay the Cow Note in full and have additional
funds sufficient to make the 2009 annual payment on the FLCA note
(Note 90) if the dairy facility had not been sold already.  Id.

What the contents of Ex. 25 suggest is that in late October
2008 Ms. Borges would have been justified in thinking that AGNM
wanted her to get the cattle sold (and she to be the one to get
that done), and that AGNM was also expecting some sort of plan
from her (perhaps with AGNM input) that would provide for the

_____

2009 to sign an agreement releasing the CWT funds under threat of
AGNM filing suit.

    [12] At the time, Note 56 (the 2008 Cow Note – Ex. C) was
coming due December 1, 2008, although Note 60 (Equipment Note –
Ex. L) was not due to be paid in full until August 1, 2011 and
Note 90 (Real Estate Note - Ex. O) not until June 1, 2026.

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 13 of 109

continuing assured paydown of the FLCA note, and that AGNM would cooperate in that process. This provides a context which may explain somewhat why Ms. Borges did not communicate with AGNM much about the proposed March 2009 Devine Farms transaction.

In December 2008, Ron Pietersma, a dairy broker who had worked with the Borges' previously, tentatively put together a transaction that would have resulted in the sale of the herd, but through no one's fault that transaction was never consummated. Another proposed sale, involving a broker named Brett Bynum of Texas Holstine [sic], Inc., working with Jackie Corley of Debine Farms, also failed to materialize around the beginning of 2009.[13]

The next transaction that the Borges' attempted was the one with Devine Farms 10, LLC, and Mr. Corley (Devine Farms and Corley are used interchangeably in this memorandum as appropriate). Mr. Corley did not have access to sufficient funds to purchase the herd, much less the entire dairy operation. So he and Ms. Borges made arrangements for the use of Borges assets

---

[13] In March 2009 Bynum sued Borges' and AGNM, among others, for commissions he claimed he was owed by virtue of his efforts to put a sale of the herd together. In a letter that AGNM delivered to Ms. Borges on the morning of March 13, there is a reference to setting aside $228,000 of the sale proceeds in escrow pending settlement of the dispute between Borges' and "Texas Holding, Inc." That suit complicated everyone's lives and undoubtedly raised the stress levels of several persons, but had relatively little effect on the Devine Farms transaction or its aftermath.

to facilitate the sale of the herd, in an arrangement that bore some resemblance to a leveraged (partial) buyout. However, neither of them informed AGNM of any details until very shortly before the proposed closing of the arrangement.

Their arrangement began with Ms. Borges assigning the milk checks beginning March 1, 2009 to Corley. That is, the proceeds of milk sold to DFA starting March 1, which would result in a check about two weeks later, would, and did, go to Mr. Corley. The arrangement also included having Mr. Corley lease the dairy beginning about the middle of March, and using the dairy to both maintain the cows and milk production, sell off as much of the herd as necessary to pay AGNM enough to obtain a release of the rest of the herd. The sales that would make up the liquidation of the herd were to be through an escrow arrangement managed by a title company. With a payoff of about $6.1 – 6.3 million on Note 56, and a proposed purchase price of $7.6 million, Mr. Corley would be able to pay Ms. Borges about $1.3 million. That in turn would enable her to pay most of her accounts payable (she had large overdue accounts payable) and have funds left over to maintain a farming operation. The $7.6 million would also allow Mr. Corley (more accurately, Devine Farms) to keep some of the cows, which would be sent to the Devine Farms operation in Muleshoe, Texas. As of late February, Mr. Corley was claiming to

have had as much as $5 million worth of cattle purchase commitments (presumably arranged with Messrs Faria and Craig) and in fact enough to permit Devine Farms to purchase the remainder of the herd.  Exs. 70 and 71.  Sometime after the completion of the sale and shipping of the herd, to take about a month, the temporary lease of the dairy would end.  At that point it could be sold to retire more AGNM debt.  And, with the sale of the herd, Ms. Borges expected that she and AGNM would reach an agreement on a lower interest rate on Note 90.

Although AGNM first learned of some deal in the making as early as February 2009 and began making inquiries and asking for details then, Ex. AA[14], Ms. Borges inexplicably chose not to disclose the entire arrangement to AGNM until shortly before the proposed closing.  And AGNM was presented with a fait accompli in the assignment to Devine Farms of the milk checks.[15]

---

[14] Ex. AA is the March 2, 2009 e-mail from Ms. Moncrief to upper management.  Part of the e-mail reports a conversation in which Mr. Bynum allegedly told Ms. Moncrief that Borges' had allegedly asked him to sell the herd for $7.1 million but provide a [fake] contract to AGNM showing a sale for only $4.1mm. Whether there was anything to the story is certainly debatable, but the important point is that it generated anxiety at AGNM about the loan and the disposition of its collateral.

[15] How the milk checks started going to Devine Farms without AGNM having any notice of that fact, much less any say in the decision, is something of a mystery, given that AGNM had a lien on the sale proceeds and that in fact DFA had been sending the milk checks to AGNM or that AGNM had been directly receiving the payments by means of automated clearing house (ACH) drafts.

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 16 of 109

As it was, Peggy Moncrief first received a copy of the proposed contract between the parties late on Tuesday, March 10, 2009, and immediately forwarded it to upper management that evening. Ex. BB. The proposed closing was to take place on the morning of Friday, March 13. Ms. Borges essentially gave AGNM a little more than 60 hours to react to, and hopefully cooperate with, the proposed arrangement, a critical part of which (the assignment of the DFA payments) had already been completed.

Although there is a considerable dispute between the two sides about the timing of delivery of payoff figures at that moment for both Loan 56 (about $6.3 million) and for the entire debt then owed AGNM (about $9.4 million), what is clear is that fairly quickly AGNM's upper management (which did not include Ms. Moncrief) decided to demand all the net proceeds from the sale of the herd. That decision was justified by when and what AGNM

---

Ultimately, Devine Farms ended up with approximately $65,000 of DFA proceeds, and approximately $90,000 were deposited in the registry of the Fifth Judicial District Court. On October 30, 2009 the $90,000 was finally turned over to AGNM, Ex. E at 87, in the context of a September 2009 settlement of two lawsuits that had been filed because of that assignment. Ex. 267. The result was not only an absolute loss of funds to AGNM and Borges' (plus the cost of two lawsuits), but also a crimp in the cash flow at an inopportune time. See Ex. E at 60 (March 17 receipt of $261,134) through 64 (April 22 receipt of check from State District Court for $160,778 and April 27 receipt of $173,072 DFA milk check), showing a five-week hiatus in receipt of milk proceeds.

learned of the proposed (and partially completed) transaction
with Devine Farms, which itself came against a background of,
among other things, increasing distrust arising from the Bynum
lawsuit and the allegations (made but certainly not proved) of
someone trying to mislead AGNM with a fake contract.  And the
decision to require payment of all the proceeds to AGNM, together
with the background that led to that decision, justified AGNM
fully informing all the parties about what the complete
Borges/AGNM debt picture was.  The Court finds that Mr. Yoakum
was credible in testifying about his concerns to protect and
preserve AGNM's rights in the collateral to assure payment of the
total debt owed AGNM, and in testifying that he was not trying to
torpedo the deal.

Unfortunately, in another puzzling instance of stunningly
poor communication, AGNM, having previously left the (correct)
impression that it would release its lien on the cattle for (1)
the receipt of funds to pay in full the Cow Note ($6.1 to $6.3
million) and (2) the receipt of the remainder of the net funds,
it faxed a pay off figure, and apparently only one pay off
figure, to Mr. Phil Brewer, who was consummating the transaction
and orchestrating the closing on behalf Mr. Corley.  The payoff
was faxed the evening of Thursday, March 12, the day before the
scheduled closing.  That single pay off figure was for $9.4

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 18 of 109

million, far more than the $7.6 million that was the subject of the closing. In consequence, Mr. Brewer, apparently believing[16] that AGNM would not permit, among other things, payment to a calf raiser with a possessory lien on 400 of the calves that were part of the herd being purchased, announced there would be no closing, that the deals for the sale of the herd and the lease of the facility were off, and that he had advised his client to go back home to Texas.

In fact, that was not AGNM's position. A letter to Ms. Borges dated March 13 and hand-delivered to her that morning clearly stated otherwise. See Testimony of Dale Moorman, Bill Yoakum and Maria Borges.[17] Indeed, against a background of AGNM

---

[16] The Court is not clear that this one miscommunication by AGNM was the sole cause of the collapse of the deal. Subsequent e-mails suggest that Mr. Corley may have had some questions about cow counts. They even raise a question with the Court about whether Mr. Corley was not hoping to be able to purchase the cattle for somewhat less per head than he had agreed to in the February 27 purchase agreement. The Court wonders why, if Mr. Corley really wanted to do this deal, Mr. Brewer, instead of sending the March 13 letter announcing the deal was off, did not instead send a short letter asking "Really – that's the pay off you are expecting?" Given that the parties were (due mostly to Mr. Brewer's continued efforts) on the verge of a closing, one has to wonder why he told his client to leave town before confirming that there could be no deal.

[17] The testimony is that the letter agreed that (1) $228,000 could be put into an escrow pending a resolution of the dispute between Borges' and Texas Holding, Inc. [sic – should be "Texas Holstine, Inc."], Borges to keep the proceeds of the lease on the facility, Borges' to keep the entire milk check to be received the following week, $97,000 into escrow to deal with payment as

wanting all the net proceeds of the sale, the terms of the letter, signed by Mr. Logsdon, seem designed to facilitate the deal.

That Friday morning, when everyone had gathered for the closing, Mr. Logsdon called Ms. Borges into another room at the title company and presented her with the letter from AGNM. Effectively Ms. Borges was told that, other than some relatively small items to be reserved to pay certain obligations and the allowance to her of certain non-closing proceeds – the monthly lease payment of $30,000 from Mr. Corley and the mid-March milk check which turned out to be $261,000, both of which by rights AGNM was entitled to receive -- the proceeds of the sale were to go to AGNM in their entirety. Apparently that made the transaction entirely unworkable for Ms. Borges. She was extremely angry and stormed out of the meeting with Mr. Logsdon and headed back to the dairy. The closing, to the extent it might have taken place, collapsed and never did take place.

---

needed to the calf raiser, with the remainder of the net closing proceeds to go to AGNM. The letter also stated that any request for rate reductions, change of payment dates, restructure to include payables, etc. would be considered upon closing of the livestock sale and application of proceeds as outlined. As the Court emphasizes below in this memorandum opinion, contrary to the repeated assertions of Borges', AGNM never agreed to lower the interest rate on the Facility Note (Note 90). It agreed only that upon the sale of the cattle, it would discuss that issue.

In the meantime, the proposed sale, looked at against the backdrop of the overall lending and collateral picture, had caused AGNM to examine its collateral position. It had discovered that the legal description attached to the 2006 Mortgage did not include all the real property which both AGNM and the Borges' appear to have intended to include in the mortgage at the time the mortgage was signed. Specifically it did not include 220 acres of farmland attached to the dairy facility and also used to grow crops for feed. To remedy this AGNM took the original mortgage which had been signed and acknowledged by the parties and recorded in Eddy County, covered up the recording notations on the first page, added additional pages to the legal description to include the 220 acres, added "** Corrected **" to the first page (so the title of the document read as a "Corrected Line of Credit Mortgage"), and then drove down to Carlsbad on March 13 and had the mortgage "rerecorded" early that afternoon. It did not obtain signatures from either of the Borges', nor of course acknowledgments of their signatures, on the modified document, nor did it request such of them. It took no further action to deal with the defective legal description other than to foreclose on – and in effect seek approval of - the modified mortgage in the course of this foreclosure action.

Subsequently Mr. Corley approached AGNM with a conditional offer to purchase the herd and all the milk checks from March 1, 2009 forward for $6.8 million.  AGNM was willing to accept this offer, but Mr. Corley could not come up with that large a sum (at least as quickly as AGNM needed), so there never was a sale of any sort to him.

What happened after that was a painful denouement.  Note 56 was extended several times, through July 1, 2009.  This was done in major part to permit further lending in order to preserve the collateral (the dairy herd); regulations applicable to AGNM allowed further advances even if a loan was over the credit limit but did not allow further advances for matured or past due loans.  AGNM, faced with a lending limit on this loan that had sometimes been reached or exceeded, repeatedly loaned just enough money (and sometimes not enough) to feed the cattle, to permit Ms. Borges to make payroll (though not both at the same time) and to cover some other expenses.  Almost every time the process required documentation from Ms. Borges to be delivered in Roswell, the signing by Ms. Borges of an optional advance agreement, and a waiting period before delivery of the funds that threatened to result in hungry cows.[18]  The process was

_____

[18] The testimony, which the Court finds credible, was that in fairly short order, hungry dairy cows reduce the amount of

continually stressful for Ms. Borges.

It was during this time that AGNM informed Ms. Borges that it was raising (retroactively, from January, 2009) the interest rate from 3.55% per annum to 6.01% on Note 56 (but not on Notes 60 and 90, which in any event were not at all in default) and demanded her assent to that change as a condition of continuing to receive funding for feed and payroll. She consented to the demand. The demand for the additional interest was based on AGNM's alleged declaration of a default on Note 56, purported to have taken place on December 12, 2008[19], and based on AGNM's concern that it might not get paid in full.[20] Ms. Borges had not

---

milk they produce. These were Jerseys, which produce a higher butterfat content than Holsteins. Thus regular timely feeding of high grade feed to the herd was a prerequisite to full high-quality (high fat) milk production and therefore to the ongoing receipt of the DFA checks in the maximum amount.

[19] The evidence is in conflict about when and even if a default was declared on the Cow Note. There was never a declaration that the other two notes – the Equipment Note and the Real Estate Note – were in default, but the notes had cross-default provisions.

[20] Note 56, at 2, recites in part:
Default: I will be in default if ...
(3) I fail to pay, or keep any promise, on any debt or agreement I have with you or with any of your Affiliates;
...
(7) I do or fail to do something which causes you to believe that you will have difficulty collecting the amount I owe you;...
Borges' were current on payments on all three notes through at least June 30, 2009. Ex. 175.

been notified of the declaration of default at the time of the alleged declaration.

In April 2009 Ms. Borges and AGNM learned of a CWT program to pay dairies to stop producing milk by getting out of the business (and staying out for at least a year) and to send their cattle to slaughter. Ms. Borges with the emphatic approval[21] of AGNM submitted a bid dated May 1, 2009. Ex. 176. The bid, at $8.42 per hundredweight, was far higher than AGNM thought prudent. AGNM, based on other bids for the CWT program, wanted the bid to be about $4.00 or $5.00 per hundredweight out of fear that a higher bid would be rejected. To the surprise of AGNM and the delight of everyone, Ms. Borges' bid was accepted.

Ms. Borges then arranged with Lewis Land & Livestock, Ltd., Co. through Steve Lewis ("Lewis") to transport the cattle to the packing house and obtain payment to be delivered to AGNM, much the same as he had done before. In this instance, however, AGNM, contrary to the arrangements it usually agreed to, insisted initially that any checks come first to it, and it would then pay the trucking costs and the commissions to Mr. Lewis. When Mr. Lewis hotly refused, AGNM insisted instead on further

_____

[21] In fact, Mr. Logsdon admitted that AGNM insisted that Ms. Borges submit a CWT bid. The evidence seems to show that, as it turned out, there was nothing better on the horizon, and the results of the CWT bid were quite favorable.

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 24 of 109

arrangements which it asserted were necessary in light of the fact that this was a CWT herd-retirement sale.  This caused Mr. Lewis to double his commission from $1.00 per hundredweight to $2.00 (aside from the trucking bills), resulting in an extra charge, essentially paid by Borges', of [$78,352.80 – $39,176.40 =] $39,176.40.[22]  Net proceeds of approximately $1.2 million were paid to AGNM.

By July 1, 2009, the status was that the cattle were mostly all gone[23] (the packing house proceeds – approximately $1.2 million – had been paid to AGNM in June – Ex. E, at 75-77), proof of the slaughter of the herd was about to be sent to CWT triggering a check from CWT for $3.6 million, AGNM was awaiting a signed agreement from Ms. Borges to send to CWT so the funds would be delivered to AGNM, and AGNM had initiated legal action to obtain the milk checks – about $165,000 worth – that had been diverted to Mr. Corley or simply not paid to AGNM.  Ex. 253 (AGNM status report on loans as of July 1, 2009).  Since the dairy was no longer operating, there was no need for further extensions of the Cow Note in AGNM's opinion, because there would be no need

_____

[22] Given the extra work, aggravation and expenditure of a portion of Mr. Lewis' goodwill with the packing houses to accommodate AGNM's demands, the increased commission to Mr. Lewis was not unreasonable.

[23] There were still a few heifers that were subsequently sold within the next month or so.

for further advances to preserve its non-existent collateral.

Although AGNM finally started receiving again the milk checks, with the herd gone, that source of income ended, with the final payments on all three notes from the milk checks being made on July 20, 2009.  In the meantime, a dispute had arisen between Borges' and AGNM concerning the CWT proceeds; Ms. Borges insisted that the commercial security agreement did not give AGNM a lien on those proceeds[24], and AGNM insisted otherwise.  AGNM gave Ms. Borges a deadline of August 12, 2009 to agree to turn over those funds to AGNM; she refused to do so.

On August 14, the Cow Note was put on nonaccrual status.  Then on August 28, 2009, as threatened, AGNM commenced this foreclosure action.  That action proceeded until the Borges' filed their joint chapter 11 petition on June 1, 2010, after which the foreclosure action was removed to this Court by Borges'.  It was after that that the CWT proceeds were transferred into the registry of this Court, where they remain today.  In the meantime, of the diverted DFA proceeds (the milk checks), AGNM has received the approximately $90,000 which DFA had originally interpleaded into the Fifth Judicial District Court.  The initial $65,000 that went to Mr. Corley was kept by

---

[24] Her position is set out in the August 10, 2009 letter from Mr. Arland to Mr. Rowley.  Ex. 259.

Case 10-01170-nlj   Doc 182   Filed 12/31/12   Entered 12/31/12 19:36:25 Page 26 of 109

Mr. Corley and therefore was not applied to reduce the debt owed on the Cow Note.

Relations between AGNM and members of the Borges family did not get any better. AGNM suspects that someone from the Borges family either stole, or learned about but did not immediately report the theft of, irrigation sprinklers and related equipment, and refrigeration units and copper tubing from the dairy sometime during the winter of 2009-2010, in contravention of AGNM's lien rights. At trial it appears that Borges' were arguing that someone but not the Borges' stole the equipment and copper tubing, and the Borges' produced a copy of a police report to show that in February 2010 they reported such a theft.

**Analysis**

The events of the week of March 9-13, 2009, are the epicenter of the primary (but far from only) dispute between the two sides. In essence Debtors are arguing that if AGNM had cooperated with the Devine sale, AGNM would have ultimately been paid in full and Debtors would have been able to survive financially. AGNM is arguing that implementing or consummating the proposed transaction would have put at risk AGNM's chances of full repayment and that it therefore acted reasonably to protect itself. The Court finds that AGNM has the better argument.

In brief, the Court makes two rulings that resolve the basic

issues underlying this case.  First, the Court finds that the inadvertent failure to include the 220 acres in the legal description attached to the 2006 Mortgage was not remedied by AGNM's purported "rerecording" of the corrected mortgage in 2009. AGNM reasonably was worried about whether the 220 acres would continue to collateralize its loans, a worry that turns out to have been justified by this Court now ruling that Borges' as debtors in possession had the right to exercise the strong arm powers granted them by section 544(a)(3) to void any purported lien on the 220 acres.

Second, the Court finds that the Devine sale as structured would more likely than not have resulted in the liquidation of the herd for the anticipated $7.6 million but that AGNM's collateral position left it no room (in the course of legitimately looking out for its own interests) to give up any of its collateral without risking having some of its debt become unsecured.

**Avoidance of the lien on the 220 acres**

Ms. Borges contends that, as the debtor in possession, she is entitled to avoid the Corrected Mortgage pursuant to 11 U.S.C. § 544(a).  AGNM asserts that Ms. Borges cannot avoid the Corrected Mortgage because she had constructive notice of that document.

Under Section 544(a), a bankruptcy trustee or debtor in possession has the power to avoid certain transfers of real property by the debtor. More specifically, Section 544(a)(3) allows the trustee or debtor in possession to avoid a mortgage or lien if it could be avoided by a hypothetical bona fide purchaser of the property. See Watkins v. Watkins, 922 F.2d 1513, 1514 (10th Cir. 1991) (applying Section 544(a)(3) to determine whether the trustee may assume the position of a bona fide purchaser of real property); In re Colon, 563 F.3d 1171, 1173 (10th Cir. 2009) (same). Sections 544(a)(1) and (3) as follows:

> The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—
> (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists....
> (3) a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

The power to avoid transfers under 11 U.S.C. § 544(a) is known as the "strong arm power." In re Colon, 563 F.3d at 1173 (internal citations omitted). The strong arm power arises

regardless of whether the trustee or debtor in possession has actual knowledge of the mortgage or lien.  See 11 U.S.C. § 544(a) ("without regard to any knowledge of the trustee"); McCannon v. Marston, 679 F.2d 13, 15–16 (3rd Cir. 1982) (distinguishing actual "knowledge" from actual "notice").  Essentially, "the bankruptcy code imposes a fiction on the debtor-in-possession, who likely has actual knowledge of any transfers the debtor made, in order to give the … debtor-in-possession … the ability to avoid certain transfers for the benefit of the bankruptcy estate."  In re Crowder, 225 B.R. 794, 796 (Bankr. D. N.M. 1998).  To determine whether a debtor in possession qualifies as a bona fide purchaser under Section 544(a)(3), the Court must examine whether the debtor in possession had constructive notice of any encumbrance under applicable state law, regardless of whether the debtor in possession had actual knowledge of the encumbrance.  In re Colon, 563 F.3d at 1173.[25]

Under New Mexico, a bona fide purchaser of real property who does not have notice of an encumbrance takes the property free of the encumbrance.  See N.M.S.A. 1978 § 14-9-3 (1990) ("No deed,

_____

[25] See also Watkins 922 F.2d at 1514 ("The trustee … assumes the bona fide purchaser position subject to the state's constructive notice law."); Virginia Beach Federal Sav. And Loan Ass'n v. Wood, 901 F.2d 849, 852 (10th Cir. 1990) (State law controls issues such as whether a security interest has been perfected or whether a debtor in possession has assumed the status of a bona fide purchaser under Section 544(a)).

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 30 of 109

mortgage or other instrument in writing not recorded … shall affect the title or rights to, in any real estate, of any purchaser, mortgagee in good faith or judgment lien creditor, without knowledge of the existence of such unrecorded instruments.").[26] A bona fide purchaser may have actual or constructive notice of the encumbrance. A prospective purchaser of real property is deemed to have constructive notice of any encumbrances or adverse claims to that property if the purchaser has "[k]nowledge of such facts as ought to put a prudent [person] upon inquiry as to the title." Hunt v. Ellis, 27 N.M. 397, 401, 201 P. 1064, 1065 (1921). Once a prospective purchaser has knowledge of facts that trigger a duty to inquire about the title, "that purchaser must perform a reasonably diligent investigation-one that would lead to the knowledge of the requisite facts by the exercise of ordinary diligence and understanding." City of Rio Rancho v. Amrep Southwest Inc., 150 N.M. 428, 260 P.3d at 422-423 (internal quotations omitted). If the prospective purchaser chooses not to inquire further, they

---

[26] See also City of Rio Rancho v. Amrep Southwest Inc., 150 N.M. 428, 260 P.3d 414, 422 (2011) ("A good faith purchaser of real property who has invested money in the property without notice of a third party's unrecorded interest in that property is protected under New Mexico law.").

are nonetheless charged with knowledge of all facts that "a reasonably diligent investigation would have ascertained."  Id.[27]

Despite the rather broad definition of constructive notice under New Mexico law, a mortgage must nonetheless be properly recorded in order to provide constructive notice to any prospective purchasers.  Pursuant to N.M.S.A. § 14-9-1 (2003), "[a]ll … mortgages … shall be recorded in the office of the county clerk of the county or counties in which the real estate affected thereby is situated."  Before a mortgage can be recorded, it must be properly acknowledged.  See N.M.S.A. § 14-8-4 (2011).  Thus, an unacknowledged mortgage cannot provide constructive notice to a bona fide purchaser, notwithstanding the fact that it appears in the county land records.  See N.M. Properties, Inc. v. Lennox Ind. Inc., 95 N.M. 64, 65, 618 P.2d 1228, 1229 (1980) (finding that unacknowledged instruments may not be treated as recorded and/or provide constructive notice to good faith purchasers); In re Crowder, 2007 WL 7689183, *4 (Bankr. D. N.M. 2007) (finding that an unacknowledged document

_____

[27] See also Citizens Bank of Clovis v. Hodges, 107 N.M. 329, 331–332, 757 P.2d 799, 801–802 (Ct.App. 1988) ("[O]ne who purchases real estate in the possession of someone other than his vendor is, in good faith, bound to inquire of such possessor what right he has in the property, and failing to make such inquiry, equity charges him with notice of all facts that such inquiry would disclose.").

was not binding against prospective purchasers because it was ineligible for recording).[28]

This Court addressed the issue of constructive notice in the context of 11 U.S.C. § 544(a)(3) in <u>Jesko v. Bank of America, NA (In re Jesko)</u>, Adv. No. 04-1166 (Bankr. D. N.M. 2006). There, the bank sought to enforce a mortgage from a trust. However, the mortgage was acknowledged by the trustees in their individual capacities and not as trustees of the trust. The Court found that under New Mexico law, an improperly acknowledged mortgage is considered unrecorded. Because such a mortgage is treated as if it does not appear in the county land records at all, the Court concluded that it cannot provide constructive notice to a bona fide purchaser. <u>Id.</u> at p. 11-12.[29]

---

[28] <u>See also</u> <u>F&S Co. v. Gentry</u>, 103 N.M. 54, 55, 702 P.2d 999, 1000 (1985) (holding unacknowledged partnership certificate "could not function as constructive notice … of [a] conveyance of … realty" because "absent a valid acknowledgment, an instrument may not be treated as recorded instrument"); <u>McBee v. O'Connell</u>, 16 N.M. 469, 120 P. 734, 736 (1911) ("[A]n unacknowledged instrument of writing, though filed and placed of record, should not be considered of record.") (internal quotations omitted).

[29] The Tenth Circuit Court of Appeals has also addressed the issue of constructive notice in the context of 11 U.S.C. § 544(a). In <u>In re Colon</u>, 563 F.3d 1171 (10th Cir. 2009), for example, the Tenth Circuit interpreted Kansas law to find that the trustee had constructive notice of a mortgage notwithstanding the fact that it referenced an incorrect lot number. The Court concluded that the trustee could not avoid the mortgage because the correct number was referenced in other recorded documents in the chain of title. Unlike the present case, however, the instruments that provided constructive notice to the trustee in <u>In re Colon</u> were all properly acknowledged and of record.

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 33 of 109

The Court is persuaded that Borges is entitled to avoid the Corrected Mortgage under 11 U.S.C. § 544(a)(3) because it does not provide constructive notice to a hypothetical bona fide purchaser. Borges executed and delivered the 2006 Mortgage in favor of AGNM on June 6, 2006. Roughly three years later, AGNM realized that as result of the parties' mutual mistake, the property description in the 2006 Mortgage did not include an additional 220 acres of land for which AGNM had bargained. Rather than coordinating with Ms. Borges to record a corrected version the 2006 Mortgage, AGNM unilaterally modified the property description contained in the 2006 Mortgage and recorded the Corrected Mortgage without her knowledge or consent. The unacknowledged Corrected Mortgage is therefore ineligible for recording and cannot serve as constructive notice to any prospective purchasers. See 9B Am. Jur. 2d Bankruptcy § 2022 ("The trustee may avoid a recorded deed of trust or mortgage, where the absence of a proper acknowledgment means that the deed is not entitled to be recorded and therefore cannot impart constructive notice under state law.").

AGNM argues that the Corrected Mortgage was acknowledged because the 2006 Mortgage and the Corrected Mortgage are merely two versions of the same document. AGNM believes the acknowledgement contained in the 2006 Mortgage satisfies the

acknowledgement requirement as to the Corrected Mortgage.  The
Court disagrees.  First, the two documents are not the same; they
contain distinctly different legal descriptions of the property.
Second, the New Mexico recording statute is quite broad and
requires each and every instrument to be acknowledged before it
is recorded.  See N.M.S.A. § 14-8-4 ("<u>Any instrument of writing</u>,
not duly acknowledged and certified, may not be filed and
recorded, nor considered of record….") (emphasis added).  If the
Court were to accept AGNM's argument that the acknowledgement in
the 2006 Mortgage fulfilled the requirement to acknowledge any
associated documents under N.M.S.A. 14-8-4, parties could simply
modify and rerecord a mortgage without the knowledge or consent
of other parties to the agreement.  This is not consistent with
the law regarding unilateral modification of mortgages and other
contracts.  <u>See, e.g.,</u> 17A C.J.S. Contracts § 545 ("Generally,
one party may not unilaterally modify a contract; mutual assent
is required."); <u>Blades v. Wells Fargo Bank NA</u>, 2012 WL 2885133,
*2 (2012) (a deed could not "unilaterally modify [a] mortgage
agreement because … [d]efendants did not consent to any
modification").[30]

_____

[30]See also <u>In re Gray</u>, 410 B.R. 270, 275–78 (Bankr. S.D.
Ohio 2009) (finding that a public official had no authority to
unilaterally correct a defective mortgage document by altering
and rerecording it); <u>Coviello v. Richardson</u>, 76 Mass.App.Ct. 603,
608, 924 N.E.2d 765 (2010) (noting that the plaintiff "could not

AGNM also argues that the Change of Ownership of Water Rights form, which was executed on the same day as the 2006 Mortgage, provided constructive notice that AGNM had an adverse claim to the additional 220 acres. AGNM contends that any prudent prospective purchaser would inquire further as to the nature and extent of the property pledged after learning that Borges had assigned the water rights associated with the additional 220 acres. Under New Mexico law, "[w]ater rights are … not tied to a particular location or even a particular source." Walker v. U.S., 142 N.M. 45, 53, 162 P.3d 883, 890 (2007) (citing N.M.S.A. § 72-5-23 (1985)). A water right is a "separate protected property right … [that] can be sold, leased, or transferred." Id. (internal quotations omitted). In this state, where water is scare and natural resources are plentiful, it is not uncommon for property owners to sever the mineral or water rights from their land. As such, the assignment of water rights is not likely to alarm a prudent person or inspire them to question whether a particular piece of land was pledged in relation to the assignment.

**Whether AGNM Can Foreclose on the Additional 220 Acres**

AGNM contends that it entitled to foreclose on the entire 550 acres of the Property because the Corrected Mortgage became

─────────────────────

unilaterally change the mortgage commitment date").

effective on the date it was recorded (March 13, 2009). Having concluded that Borges is entitled to avoid the Corrected Mortgage under 11 U.S.C. § 544(a)(3) because the Corrected Mortgage was never acknowledged and/or recorded, the Court need not address this argument.

It is undisputed that the 2006 Mortgage was properly acknowledged and recorded with the Clerk of Eddy County, New Mexico. The Court therefore finds that AGNM is entitled to foreclose on the 2006 Mortgage, and in particular the 337 acres of the Property described therein. For the reasons stated, AGNM is not entitled to foreclose on the additional 220 acres of the Property described in the Corrected Mortgage.

**Overall reasonableness of AGNM's actions**

AGNM argues that the proposed sale to Devine Farms would not have worked because it left AGNM without control over its own collateral and because Corley never had the money to purchase the herd in any event. First, the escrow arrangement was designed specifically to solve the control problem. AGNM's objection that it had never had its cattle collateral sold through escrow does not negate the security of that device. Indeed, if AGNM has ever participated in a real estate transaction, it will have used an escrow process with the title company. None of AGNM's lien on any cattle would be released unless AGNM was assured of receiving

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 37 of 109

the proceeds, and none of the cattle were leaving the dairy until all the cash for all the cattle was in escrow. And AGNM routinely allowed Borges' cattle to be shipped off and sold subject to being paid later; the Lewis transaction is but one example. And there is no reason to think that AGNM would have refused to permit the sale of any cattle unless they were all being sold at one time. AGNM Ex. E is replete with examples of sales of some but not all of the cattle. But the most telling argument against AGNM's position is that it was willing to allow the Corley transaction to take place, provided that it received all the proceeds. The Court seriously doubts that the claimed concern about an escrow arrangement not being typical was any more than an after-the-fact attempt to justify its actions.[31]

Second, the contract did not call for payment in full immediately, although it appears there might have been some confusion on the part of AGNM personnel on this issue. Compare, e.g., Ex. 71 (February 23, 2009 e-mail saying no borrowing needed

---

[31] The Court's conclusion is reinforced by portions of Mr. Yoakum's testimony. He expressed a concern that there might not be enough sale proceeds to cover the Cow Note debt. (It was obvious to everyone that the sale would not pay off, and was not intended to pay off, all the Borges' debt to AGNM.) He expressed another concern that an individual would make a bid for some of the cattle, and then leave the country without paying for them. The escrow process of course guards against both possibilities. If the money in escrow is not sufficient for any reason, there is no release of the liens, and the cattle stay at the dairy and continue to be cared for.

from AGNM to consummate sale of the herd) <u>with</u> Ex. 70 (February 23, 2009 e-mail saying buyers to lease the dairy in order to condition the heifers for later sale). Nevertheless, the circumstances, including the use of an escrow arrangement to permit a final count of the herd to assure an accurate payment would have put AGNM on reasonable notice that it might have checks in hand for sales of portions of the herd (if it consented to removal of portions of the herd) within a few days of any closing but not a single check for the entire sale amount immediately. As for resources to purchase the cattle, the Court finds that both Mr. Faria and Mr. Craig credibly testified that they had the funds to consummate the purchases they had arranged with Mr. Corley and that they frequently transacted business without written contracts. The accounting for Loan 56 evidences many substantial sales to Mr. Craig; for example, in early 2009 alone, a sale for $79,350 on March 19, $62,300 on March 25, $55,430 on April 21, and $244,238.50 three days later, on April 24. Ex. E. And while Mr. Corley did not have the funds to purchase the remainder of the herd (whatever Messrs Faria and Craig did not buy), the sale barns provided a ready outlet for those cows, as evidenced by the sale managed by Mr. Lewis and the numerous sales listed in Ex. E, or the parties could have

conducted a disbursal sale at the dairy itself, as suggested in AGNM's internal documents.

However, the reduction of the debt by the $6.3 million rather than $7.6 million would have left AGNM owed approximately (9.4 – 6.3 =) $3.1 million rather than (9.4 – 7.6 =) $1.8 million. With both the herd and the milk proceeds gone (no cows = no milk = no milk checks), AGNM's remaining collateral would have been the dairy and the farm less the 220 acres that were not explicitly covered by the mortgage. In consequence, AGNM's actions to collect the maximum amount it could from the collateral it indisputably retained rights in were reasonable, and thus the affirmative defenses or counterclaims that require some sort of malfeasance or misfeasance on the part of AGNM cannot stand.[32]

The form 1100 report serves as an AGNM status report on a borrower's loans. Ex. 42 is one such report dealing with real estate, dated January 1, 2009, and reports that based on a December 22, 2008 appraisal, the value of the dairy and the other real estate is $5.35 million, securing repayment of the Note 90 debt at that time of $3.01 million, resulting in equity of about

---

[32] The issues of the applicable interest rate, when any default occurred, etc. are considered separately from the discussion of the bulk of the affirmative defenses and counterclaims.

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 40 of 109

$2.34 million at that time.  That appraisal appears not to have been entered into evidence.

The Court is a bit skeptical about whether AGNM genuinely believed the in value represented on the report, since in these circumstances, with AGNM concerned about maintaining its borrowing base with FCBT, it would have wanted to show as strong a collateral position as possible, even if the Borges' loans were risk rated at "11".

Further support for the Court's concern comes from Ex. 55, an optional advance analysis form dated January 30, 2009 which values the herd at $10,149,010.  Ex. 72, a loan committee report and approval of an optional advance on the Cow Note, purports to value the dairy herd at $10,821,000 as of February 25, 2009.  Ex. 114 is a loan committee report and approval (with the underlying document signed off by Joe and Maria Borges) dated March 19, 2009 of an optional advance purporting to value the dairy herd at $9,310,270.  And Ex. 25 seems to make it clear that at least in late October 2008, both AGNM and Ms. Borges believed (or wanted to believe) the dairy herd had a much higher value than turned out to be the case.  All these documents were, in the circumstances, self-serving for both AGNM and the Borges', and contrary to the evidence of the Borges' attempted sales in 2008 and 2009.  Hindsight certainly shows that the herd was

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 41 of 109

overvalued.  Thus the Court places little credibility in the valuations of the cattle.[33]

That in turn leads the Court to wonder about the reliability of the December 2008 appraisal, and the reports based on it.  In consequence, the Court believes that there is some utility in relying at least partly on the May 18, 2006 appraisal (Ex. W), since it would have been generated in circumstances more conducive to accuracy.  That appraisal had valued the dairy and

---

[33] What the values of the collateral were on AGNM's books, including as viewed from the offices of Farm Credit Bank in Austin, were not necessarily the actual values (an obvious statement), nor should AGNM be considered to have genuinely thought that those were accurate values (a less obvious statement).  AGNM had no obligation, at least to Borges', to revise and update collateral values in its books on a monthly (or any other) basis.  And even if there were such an obligation, in the particular time period that this problem was playing out, when the values of all sorts of property from residential housing to synthetic collateralized deposit obligations were in such flux, it would be unreasonable to demand of AGNM that it constantly reassess and put on its books the value of all the collateral for all of its lending.  Did maintaining what may have been relatively (and probably outdated) high values for the Borges collateral benefit AGNM in its dealings with Austin?  No one should be surprised if the answer to that question is decidedly "yes".  Nor should anyone be surprised if AGNM officers harbored doubts about those high values, as was probably the case, but did not take immediate action.  Such an approach might have been considered a critical holding action to maintaining the viability of the entities (and perhaps the jobs of the officers as well).  But whether that approach might constitute some violation of a statute or a regulation or a requirement coming out of Austin or from the Farm Credit Administration, it provides no basis for compelling a conclusion that the officers actually believed those values were actual values upon which they should have relied.

land (including improvements) at $4,450,000. Given that the 2006 appraisal was almost three years old when this sale proposal suddenly arose, at a time when there was considerable turmoil in the financial markets, a recession going on, depressed milk prices but increasing crop prices, AGNM could reasonably wonder how accurate the 2006 appraisal continued to be. That of course would be a reason to obtain a new appraisal.

Nevertheless, assuming that the dairy and real estate continued to have a value of no less than $4,450,000, a remaining debt of $3.1 million (as of mid-March 2009) would have yielded a loan to value ratio of 1 to 1.44, whereas a remaining debt of $1.8 million would have yielded a loan to value ratio of 1 to 2.47. Even in stable economic times, a loan to value ratio of 1 to 1.44 for real estate (as opposed to, say, money market funds or certificates of deposit) is not especially secure; in the parlous times of the spring of 2009 during which AGNM was required to make its decisions, AGNM could reasonably fear that it might well suffer a loss of whatever value it gave up in the dairy herd. Certainly at that time AGNM cannot be said to be acting unreasonably in wanting to collect the entire $7.6 million from the sale of the herd and maintain a much higher (but, in the circumstances, not unreasonably high) loan to value ratio for the remainder of its debt and collateral. While the decisions taken

by the United States government in the waning months of 2008 and then throughout 2009 and 2010 appear to have (at least for the time being) largely averted a meltdown of the worldwide financial system and a full scale depression in the United States, in the spring of 2009 it would not have been at all obvious to AGNM, or to any similar entity in its position, that the economy was going to avoid a major collapse.

Add to that the subsequently justified concern about the status of its claim to the 220 acres as collateral for its loans. As noted, the land that was explicitly described in the legal description attached to the original mortgage, Ex. R, excluded 220 acres of farmland. Thus, AGNM would have been looking at the possibility that the total real estate covered by its mortgage was about 337 acres instead of 557 acres. That might well have reduced the value of its collateral by about (220 ÷ 557 =) 40%, resulting in a potential appraised value of ($4,450,000 * .6 =) $2,670,000. That would leave a collateral value of $2.67 million to repay $3.1 million. AGNM could find itself with a negative loan to value ratio.[34] AGNM (and probably the Borges'

_____
[34] Of course, these numbers would need to be adjusted to the extent that the December 2008 appraisal showed a real increase in value of ($5,355,000 - $4,445,000 =)$910,000. Thus, $5.355 million * .6 = $3.213 million, to cover a debt of $3.1 million. There is equity, but it is quite thin, and depends heavily on the accuracy of the appraisal. In any event, no lender would feel at ease with that thin a margin.

Case 10-01170-nlj   Doc 182   Filed 12/31/12   Entered 12/31/12 19:36:25 Page 44 of 109

originally) never intended to have AGNM only partially secured, and so AGNM acted reasonably in attempting to put itself in a position of having $2.67 million of collateral value (even assuming the remaining collateral was that valuable) securing a repayment obligation of $1.8 million, for a loan to value ratio of roughly 1 to 1.5.

In summary, then, AGNM was acting reasonably in attempting to protect its collateral position by not agreeing to permit the Borges' to keep $1.3 million or so of the sale proceeds. Thus, any cause of action that requires a finding that AGNM was acting in bad faith by insisting on receiving all the proceeds must fail. That would at a minimum apply to the counterclaims of lack of good faith and fair dealing (counter claim count 2) and prima facie tort (count 10).

The Court also finds that at no time did AGNM promise to accept $6.3 million from the sale of the herd, or indeed any amount less than the full sale proceeds. AGNM did promise to allow Ms. Borges to sell the herd; indeed, encouraged and even insisted on it. But that fact by itself does not require a conclusion that AGNM agreed to take less than all the proceeds. First, as explained above, it had no obligation to take less than all the proceeds. It could, and ultimately did, insist reasonably that it receive all the proceeds. If that is the

case, then leaving the Borges family and others with the impression that it would accept less than all the proceeds of the sale and then refusing to do so, cannot create AGNM liability. That is, if AGNM had no obligation (whether as part of good faith and fair dealing, or avoiding prima facie tort, or on whatever ground) to accept less than all the proceeds, then it cannot be found to have acted unreasonably if it left the impression otherwise (_i.e._, that it would accept less) before the deal fell apart, at least until the Borges family had taken some action that caused them to be materially prejudiced in reliance on the alleged agreement by AGNM to take less.

Beyond that, the evidence is simply not there that AGNM acted unreasonably in the circumstances. Although AGNM was insisting that Ms. Borges sell the herd and liquidate the operation to pay off her debt to AGNM, the record is clear that Ms. Borges did not inform AGNM of the proposed sale arrangements, and particularly of the need for AGNM to give up $1.3 million of its collateral, until shortly before the proposed closing of March 13. That left very little time for AGNM to fully assess its position and determine whether the proposed sale arrangements conformed with its legitimate interests.

And that is without even taking into account Ms. Borges's unilateral assignment of the milk checks to Corley without

Case 10-01170-nlj   Doc 182   Filed 12/31/12   Entered 12/31/12 19:36:25 Page 46 of 109

informing AGNM at the time, much less getting AGNM's agreement. AGNM made it eminently clear how heavily they depended on the arrival of those checks regularly. Indeed, Ex. E shows that in 2008 and 2009, a stream of checks, most for about $250,000 or more, arrived about once every two weeks, constituting the major source of repayment of all the loans. That stream was quite regular except when it was interrupted as a result of the assignment to Mr. Corley effective with the checks that would be arriving on March 17, 2009 and afterward. The Court does not find that Ms. Borges was acting in bad faith or trying to conceal anything from AGNM, only that in her determination to work out of her deep financial problems, she was less than meticulous about keeping her lender fully and immediately advised of everything that she planned to do and that she did do.[35]

The net result was that AGNM found itself faced with (1) the completely surprising loss of a huge source of repayment and (2) a proposal for the disposition of another huge source of

---

[35] The Court also finds from the evidence that to be a successful dairy farmer in good times as well as bad, one must have determination and fortitude and an ethic of hard work to a degree that many other people do not have. From the evidence and from its observations of Ms. Borges as well, the Court concludes that Ms. Borges had those admirable qualities in abundance. The Court also concludes that Ms. Borges is what might be characterized as "headstrong". And likely as a consequence of those characteristics, Ms. Borges soldiered on relentlessly in an effort to solve her problems without expecting much help from, or communicating much with, AGNM.

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25    Page 47 of 109

repayment part of the proceeds of which it was expected to simply give up. Even if AGNM's collateral position were so extravagant as to require it, reasonably, to agree to the proposed sale and its terms (decidedly not the case, as explained above), the shortness of notice would have justified AGNM in defensively insisting on all the proceeds of the collateral from the closing or, alternatively, a delay in the closing until it could accurately assess its complete position.[36]

---

[36] This analysis raises the question of whether, with a little more time and, for each side, a lot more willingness or ability to communicate with the other, the two sides could have struck a deal somewhere between the two positions that were never reconciled. One fact that suggests this possibility is the offer that Mr. Corley made to AGNM on Wednesday, March 18, to purchase the entire herd for $6.8 million. Part of what Mr. Corley offered was to pay feed bills incurred from March 1 but he also wanted all the milk checks from that point onward. Eg. GG. AGNM was willing to accept that offer. Id. AGNM was concerned about whether Mr. Corley had the funds, but otherwise did not seem to have an objection to the offer. In effect, AGNM was willing to accept $800,000 less for the herd than it was insisting on a mere five days earlier. Such a deal, overlaid on the March 13 closing, would then have had Ms. Borges receiving $800,000 instead of $1.3 million. Unfortunately, that sum may have been simply too little for Ms. Borges. She was already on C.O.D. or even prepay terms with at least one major supplier of feed, DBS Commodities. In fact, proof of claim no. 12, filed by DBS, states that DBS was owed $992,566 on the petition date. And Ms. Borges owed substantial debts to creditors other than AGNM and DBS, including to the Eddy Country Treasurer (claim no. 3 for $54,475), the Internal Revenue Service (claim no. 5 for a total of $242,985), Caterpillar Financial Services (claim no. 8 for $58,711), the New Mexico Taxation and Revenue Department (amended claim 9 for $32,725), Jordan Dairy Service (claim 13 for $146,064), Quality Liquid Feeds, Inc. (claim no. 14 for $41,502) and IVESCO (The Bessenbacher Company) (claim no. 20 for $57,162). These identified claims total approximately $1.7 million. Thus,

Case 10-01170-nlj   Doc 182   Filed 12/31/12   Entered 12/31/12 19:36:25 Page 48 of 109

Ms. Borges vigorously insists that the parties agreed on a two-step plan: (1) Ms. Borges would sell the herd and (2) AGNM would reduce the interest rate on the real estate note (Note 90) to 5% or so, such that Ms. Borges could continue the farming operation and in the process support herself. First, there is no proof that AGNM ever committed to do anything except discuss a reduction in the interest rate on Note 90. No documents reflect that AGNM, including explicitly FLCA, committed itself to doing that. In consequence there can be no liability or damages flowing from AGNM's failure to reduce the interest rate on Loan 90. Even if Ms. Borges could show that AGNM promised to reduce the interest rate, Borges has not shown any consideration to make that promise enforceable. Finally, the lack of any specific terms would make the promise unenforceable. At most, the parties had an agreement to discuss refinancing after certain conditions were met at some indefinite time in the future.

Further, there is the claim underlying all of this that by insisting on taking all the proceeds of the sale of the herd, AGNM effectively would have left Ms. Borges for a period of

---

while Ms. Borges probably could have stretched out repayment of all her non-AGNM obligations by making large initial partial payments as part of a repayment plan, the sum of $800,000 might well have been insufficient to fund a persuasive repayment plan and also support her ongoing farming operations and herself.
    In any event, no such deal ever existed.

months (until crops could be harvested and sold in late summer or fall 2009) without any cash whatever to pay the mortgage, to pay any other creditors or to support herself. This assessment of the consequences of AGNM's actions seems to be accurate. But it does not lead to a conclusion of liability on the part of AGNM. As cold as that result might be, the fact is that AGNM had no obligation to put any part of its recovery at risk in order to in effect provide support for Ms. Borges or to assure that her other creditors were paid. Ms. Borges has cited no authority that holds otherwise, and the Court is not aware of any either.

With the foregoing in mind, the Court now turns to the various counterclaims asserted by Borges', and then subsequently addresses more briefly the asserted affirmative defenses.

**BORGES COUNTERCLAIMS**

**1.    Breach of contract**

Borges' allege that AGNM breached its contracts with them in several ways, including failure to apply payments per the terms of the contract, arbitrarily increasing the interest rate on the Operating Note, and failing to reduce the interest rate on the dairy facility. They claim damages, including lost interest and other amounts to be proved.

A contract is a legally enforceable promise. UJI 13-801 NMRA. To be legally enforceable there must be an offer,

acceptance, consideration, and mutual assent.  Nance v. L.J.

Doloff Assoc., Inc., 2006-NMCA-012, ¶ 19, 138 N.M. 851, 856, 126

P.3d 1215, 1220 (citing DeArmond v. Halliburton Energy Servs.,

Inc., 2003-NMCA-148, ¶ 9, 134 N.M. 630, 81 P.3d 573).

> "A valid contract must possess mutuality of
> obligation.  Mutuality means both sides must provide
> consideration." Talbott v. Roswell Hosp. Corp.,
> 2005-NMCA-109, ¶ 16, 138 N.M. 189, 118 P.3d 194
> (internal quotation marks and citation omitted).
> "Consideration consists of a promise to do something
> that a party is under no legal obligation to do or to
> forbear from doing something he has a legal right to
> do." Id. (internal quotation marks and citation
> omitted).  A promise that puts no constraints on what a
> party may do, and in reality promises nothing, is an
> illusory promise.  Id.  An illusory promise does not
> provide consideration to support a contract.  See
> Restatement § 77 cmt. a ("Where the apparent assurance
> of performance is illusory, it is not consideration for
> a return promise.").

Sisneros v. Citadel Broadcasting Co., 2006-NMCA-102, ¶31, 140

N.M. 266, 274, 142 P.3d 34, 42.

If there is no contract, there can be no cause of action for

a breach of contract.  Joseph E. Montoya and Assoc. v. New

Mexico, 103 N.M. 224, 226, 704 P.2d 1100, 1102 (1985).  See also

Healthsource, Inc. v. X-Ray Assoc. of New Mexico, P.C., 2005-

NMCA-097, ¶19, 138 N.M. 70, 77, 116 P.3d 861, 868, cert. denied,

2005-NMCERT-7, 138 N.M. 146, 117 P.3d 952.

> "[C]ontract law is, in its essential design, a law of
> strict liability, and the accompanying system of remedies
> operates without regard to fault."  3 E. Allan Farnsworth,
> Farnsworth on Contracts § 12.8, at 190 (1990); see also

<u>Patton v. Mid-Continent Sys., Inc.</u>, 841 F.2d 742, 750 (7th
Cir. 1988) ("[L]iability for breach of contract is, prima
facie, strict liability. That is, if the promisor fails to
perform as agreed, he has broken his contract even though
the failure [was] in no way blameworthy."). As a general
principle, the purpose of contract law is to compensate the
nonbreaching party for the damages caused by the breaching
party's nonperformance. <u>[Romero v.]</u> Mervyn's, 109 N.M. [249]
at 257, 784 P.2d [992] at 1000 [(1989)] (discussing "[t]he
general rule limiting recovery in contract case[s] to
compensatory damages"). The amount of recovery should not
depend on the manner in which the contract was breached, and
the nonbreaching party should not be able to extract an
extra bonus from a breach characterized by a high degree of
fault or resulting from a low degree of care. "It is a
fundamental tenet of the law of contract remedies that,
regardless of the character of the breach, an injured party
should not be put in a better position than had the contract
been performed." Farnsworth, <u>supra</u>, § 12.8, at 189-90; <u>see
also</u> 3 Arthur L. Corbin, Corbin on Contracts § 606, at
647-48 (1960) ("[O]ne is held responsible for harm to others
if it is caused by his 'folly' or his negligent mistake, but
his responsibility need not be carried so far as to permit
others to profit by reason of his mistake.").

<u>Paiz v. State Farm Fire and Casualty Co.</u>, 118 N.M. 203, 212, 880

P.2d 300, 309 (1994).

        Consolidating the elements as they are found in
the New Mexico cases, in our view the only reasonable
reading of the cases is that the tests in Hadley and
Globe Refining comprise the common law contract damages
rule in New Mexico. We will refer to the rule as the
New Mexico rule. The New Mexico rule consists of the
following elements. A non-breaching party may recover
damages that are the natural and probable result of the
other party's breach of contract. Such damages are
allowed because the parties are presumed to have
contemplated the ordinary and natural incidents or
consequences of non-performance of the contract. <u>E & B
Specialties [Co., Inc. v. Phillips]</u>, 86 N.M. [331] at
334, 523 P.2d [1357] at 1360 [(1974)]; <u>Jones [v. Lee]</u>,
1998-NMCA-008, ¶ 18, 126 N.M. 467, 971 P.2d 858.
Consequential damages resulting from special

Case 10-01170-nlj   Doc 182   Filed 12/31/12   Entered 12/31/12 19:36:25 Page 52 of 109

circumstances may be allowed when, at the time of contracting, such damages were a likely loss in the contemplation of the parties; or, stated another way, when the contracting parties have reason to know at the time of contracting of special circumstances or a special purpose of the contract that is reasonably likely to give rise to particular damages in the event of a breach. Camino Real [Mobile Home Park Partnership v. Wolfe], 119 N.M. [436] at 446, 891 P.2d [1190] at 1200 [(1995)]; Wall [v. Patel], 104 N.M. [1] at 2, 715 P.2d [449] at 450 [(1986)]; E & B Specialties, 86 N.M. at 334, 523 P.2d at 1360; Jones, 1998-NMCA-008, ¶¶ 18-19, 126 N.M. 467, 971 P.2d 858. "[S]pecial provable damages flow from the disappointment of a special purpose for the subject matter of the contract or from unusual circumstances, either or both of which were known to the parties when they contracted." Wall, 104 N.M. at 2, 715 P.2d at 450; see McCormick [Handbook on the Law of Damages (1935)], supra, § 138, at 562 (stating that under the rule in "[t]he leading case of Hadley [,] ... losses must be either of the type usually resulting from breach of like contracts, or, if unusual, the circumstances creating the special hazard must have been communicated to the defaulter before he made the bargain"). Furthermore, the non-performing party must explicitly or tacitly agree to respond in damages for the particular damages understood to be likely in the event of a breach. Camino Real, 119 N.M. at 446, 891 P.2d at 1200; Wall, 104 N.M. at 2, 715 P.2d at 450; Jones, 1998-NMCA-008, ¶ 19, 126 N.M. 467, 971 P.2d 858.

Sunnyland Farms, Inc. v. Central New Mexico Electric Coop, Inc., 2011-NMCA-049, ¶33, 149 N.M. 746, 758-59, 255 P.3d 324, 336-37, cert. granted, 2011-NMCERT-005, 150 N.M. 667, 265 P.3d 718.

A plaintiff must prove the existence of a contract and its breach before being awarded any damages. Naranjo v. Ortiz, 94 N.M. 393, 394, 611 P.2d 216, 217 (1980). A plaintiff must also prove that any conditions precedent to the contract have been

performed.  <u>Id.</u>  <u>See also</u> <u>Western Commerce Bank v. Gillespie</u>, 108

N.M. 535, 537, 775 P.2d 737, 739 (1989):

> Generally, a condition precedent is an event occurring
> subsequently to the formation of a valid contract, an
> event that must occur before there is a right to an
> immediate performance, before there is breach of a
> contractual duty, and before the usual judicial
> remedies are available.  3A A. Corbin, Corbin on
> Contracts § 628, at 16 (1960).  <u>See, e.g.</u>, <u>Evans v.</u>
> <u>Prufrock Restaurants, Inc.</u>, 757 S.W.2d 804 (Tex.
> Ct.App. 1988); <u>Walter Implement, Inc. v. Focht</u>, 107
> Wash.2d 553, 730 P.2d 1340 (1987).

<u>and</u> Restatement (Second) of Contracts § 224 (1981) (" A condition

is an event, not certain to occur, which must occur, unless its

non-occurrence is excused, before performance under a contract

becomes due.")

    A.   <u>"Funds Held Account"</u>

Borges' argue that AGNM, by putting receipts from collateral

into a "Funds Held" account ("FH account")[37] on which it was

paying no interest, violated the terms of the notes.  The

argument is well taken.

As part of its accounting on Note 56, AGNM began maintaining

the FH account in February 2009.  Ex. E at 87-88.  On February

17, 2009, AGNM received $200,000 from the sale of some heifers.

It promptly disbursed the identical amount two days later, on

---

[37] AGNM quite appropriately characterizes the FH account as
a "cash collateral" account.  Borges' use the term "slush fund".

February 19, to pay for feed.[38]  AGNM began using the FH account

in earnest in August 2009.  From August 20 through October 30,

2009, AGNM received and deposited into the FH account a total of

$399,986, from five receipts related to sale of cattle plus the

receipt of approximately $90,000 from the Fifth Judicial District

Court for the DFA funds that had been deposited there as part of

the litigation over the milk checks with Mr. Corley et al.  At

this time the dairy herd was long gone, so what might have been

the original purpose of the FH account – to permit the expedited

payment of feed or other costs of maintaining the herd – no

longer existed.  Instead, the funds were used, from August 2009

through March 2010, to pay miscellaneous expenses such as a large

electric utility bill ($20,000) and (rather small) attorney fees

and insurance bills.  As of March 15, 2010, $354,617.94 remained

in the FH account.

    None of the funds in the account have ever been applied to

reduce the balance owed on the Cow Note.  On April 21, 2010,

counsel for AGNM e-mailed Borges' counsel saying that AGNM had

determined that $320,000 of the funds in that account were no

longer needed to pay expenses related to the collateral, and

asking counsel's consent to apply the $320,000 to the debt.  Ex.

---

[38] This momentary use of the FH account resulted in the
accrual of some interest on the Cow Note, but the Court considers
that de minimis in the scheme of things.

KK.  Inexplicably, there was no response from Borges' counsel.
Then, on June 1, Borges' filed their chapter 11 petition, and
AGNM calculated that the automatic stay prevented it from
applying the funds without obtaining relief from the stay.

AGNM asserts that it had the right to maintain the FH
account based on the Voluntary Advance Conditional Payment
Account Agreement ("VACP") (Ex. 17).  The Court disagrees.

The VACP loosely speaking is a device that establishes a
sort of savings account in which a borrower can deposit funds
with AGNM, which funds are to be held by AGNM, at interest, and
then applied to future loan repayments when the date comes to
make those loan payments.  Alternatively, the borrower can
withdraw the funds from the "savings account".  Two aspects of
the VACP are significant in this context: first, AGNM is supposed
to pay interest, <u>see</u> ¶¶ 6 and 7, and second, it is the borrower
who puts funds into the account.  ¶ 4.

Joe and Maria Borges executed the VACP on June 6, 2006, at
the same time they were signing the three promissory notes.  But
while the VACP requires that interest be paid at a rate less than
the interest rate on PCA Note 56, no interest rate is specified.
This suggests that the VACP was executed simply as part of a
package and little thought was given to it.

Case 10-01170-nlj   Doc 182   Filed 12/31/12   Entered 12/31/12 19:36:25 Page 56 of 109

More to the point, deposits into the VACP are to be made by the borrower, voluntarily. Ex. 17 at 1 ("Borrower may, from time to time, establish with the Association one or more Voluntary Advance Conditional Payment ("VACP") Accounts....") and at ¶ 4 ("From time to time Borrower may deposit funds to the Accounts."). This language clearly provides no authorization whatever to AGNM to set up a non-interest bearing account in which to hold funds that should be applied to make payments on notes, particularly without the consent of Borges'. There is no evidence that Borges' ever agreed that funds that could be applied to pay down their loans, not be applied and therefore not benefit them. While it is true that, as noted, Borges' counsel never responded to the inquiry,[39] it should have been obvious to AGNM that they had no right to be holding the funds and not applying them.

In consequence, the Court finds that the amounts received from August 2009 through October 2009 should have been applied to the Cow Note in the amounts and on the date each was received.[40]

_____

[39] AGNM argues that Borges' failure to respond to its request for guidance on applying the $320,000 should result in a denial of any relief sought by Borges'. As noted, the Court cannot understand why Borges' counsel did not respond – perhaps because counsel was too busy, or was not doing so for tactical reasons, or whatever – but that failure is not so egregious as to justify AGNM's actions.
[40] This ruling moots Borges' argument that even once the chapter 11 petition was filed, nothing stopped AGNM from applying

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 57 of 109

Doing so has the effect of reducing the amount of the interest owed by Borges' at the rate provided for by Note 56 as of the date of the application of the payments. That is, the amount of the receipts essentially bear interest at the applicable rate in the note. While the VACP makes clear that the interest VACP interest rate should be less than the note rate (understandably), the fact that the VACP in its entirety is not applicable means that the VACP interest provisions are also inapplicable[41].

The bankruptcy petition was filed on June 1, 2010. AGNM's proof of claim 16-1 (Exhibit 274) for Note 56 lists a principal balance of $4,915,949.37 and accrued interest of $276,555.51 and "receivables" of $58,521.23 (presumably attorney fees, insurance, taxes, and similar expenditures).

The Borges' accountant expert report, Exhibit 285, Part 5-C (Bates #021760) details cumulative interest accruals at 6.01% on

---

the funds to debt, including the provisions of the automatic stay. Thus the Court need not analyze subsections (3) through (7) of § 362(a) to resolve what the Court thinks is a rather surprising argument.

[41]This result raises the question of the $45,367.86 of bills that were paid out of the FH Account. Since AGNM was authorized to pay expenses from the proceeds of the collateral, it is appropriate that the accounting for Note 56 take into account those payments (including but not limited, of course, to the payment of the $20,000 electric bill). If the funds had been applied when received, these would still be outstanding. This amount will therefore be added to the "Accounts receivable" on the proof of claim. See also Ex. E at 81-87 ("accounts receivable" paid and not paid).

the daily balances in the funds held account through September 24, 2009 and 6.51% from then to May 21, 2012. May 21, 2012 is 720 days after the petition date. The Court will therefore back out 720 days of accrued interest to determine the amount accrued on the petition date. The Court will also adjust the per diem postpetition.

720 days/365 * 6.51% * $399,985.80 = $51,364.75 postpetition

Part 5-C lists interest to May 21, 2012 of $68,333.47. Subtracting the $51,364.75 postpetition accrual leaves accrued interest of $16,968.72 that should be subtracted from the accrued interest on the proof of claim as if the funds had been applied when received. This same page lists a per diem of $38.90 that should also be subtracted from postpetition accruals as if the funds had been applied. And, the Disbursements of $45,367.88 will be added to the "Accounts receivable" on AGNM's claim 16.

B. <u>Increased interest rate on Note 56</u>

AGNM retroactively increased the interest rate on Note 56 to 6.01% effective as of January 1, 2009[42]. The note does not authorize this. Furthermore, the pertinent regulations do not authorize this. 12 CFR Part 617 deals with Borrowers Rights under the Farm Credit Administration. 12 CFR § 617.7135

---

[42]The rate was again raised to 6.51% on September 28, 2009. This rate was not retroactive.

Case 10-01170-nlj   Doc 182   Filed 12/31/12   Entered 12/31/12 19:36:25 Page 59 of 109

(2004[43]), entitled "**What subsequent disclosures must a qualified**

**lender make to a borrower?**" provides:

> (a) Notice of interest rate change.
> (1) A qualified lender must provide written notice to a
> borrower of any change in interest rate on the
> borrower's existing loan, containing the following
> information:
>> (i) The new interest rate on the loan;
>> (ii) The date on which the new rate is effective;
>> and
>> (iii) The factors used to adjust the interest rate
>> on the loan.
> (2) If the borrower's interest rate is directly tied to
> a widely publicized external index, a qualified lender
> must provide written notice to the borrower of the rate
> change within forty-five (45) days after the effective
> date of the change.

Nothing in the record indicates that this CFR was ever complied

with. Furthermore, this requirement cannot be waived by a

borrower except in certain circumstances not applicable here.

See 12 CFR § 617.7010 (2005). Therefore, the Court will adjust

the interest accrued to the date of the petition, and the per

diem postpetition.

Exhibit 285, Part 5, page 2 (Bates #021756) lists interest

accrued to the petition date of $445,496.95 based on the 6.01%

and 6.51% rates. Exhibit 285, Part 5-B, page 2 (Bates #021759)

lists interest accrual to the petition date of $238,581.52 based

on the 3.55% rate. This difference, $206,915.43 should be

---

[43]This version of the regulation was effective from 2004 to
January 20, 2010.

subtracted from the interest accrued on the proof of claim.  It also shows that the daily per diem would be $478.13.

The overall impact of the "funds held" account and the reduced interest rate can be summarized as follows: AGNM's proof of claim for loan 56 principal should be reduced by $399,985.80 to $4,515,963.57.  Interest accrued but unpaid should be reduced by [$16,968.72 + $206,915.43 =] $223,884.15 to $52,671.36.  Accounts receivable is increased to [$58,521.23 + $45,367.86 =] $103,889.09.  The accrual of interest post-petition should be reduced to [$478.13 - $38.90 =] $439.23.

C.   Failure to reduce interest rate on Note 90

Ms. Borges repeatedly invokes the "Two-Step Plan" as a major basis for its claims against AGNM.  The Two-Step Plan was that "(1) the Borgeses would sell the cattle and pay the Cow Loan; and, (2) the Facility Loan would be restructured with a lower interest rate and a change from monthly to annual payment, with the Borgeses to continue farming the land until a buyer could be found."  E.g., Borges Closing at 5.[44]  Unquestionably both

_____

[44] Underlying the Two-Step Plan was a poignant reality: Ms. Borges was ready (and deserved) to be working far less, and far less hard, than she had been.  Her life story was and is awe-inspiring.  An immigrant with little education but highly intelligent and with a fierce determination and work ethic, she married Joe Borges in 1971 and then with him established successful dairies first in California and then in New Mexico. Indeed, as noted, the J & M Dairy was a very large dairy, and easily one of the largest in the state.  The evidence at trial

Borges' and AGNM agreed on the sale of the cattle and payment of the Cow Note.  Equally unquestionably, AGNM never agreed to the restructure.  Other than Ms. Borges' testimony, there is no evidence, including no documentary evidence, that supports the claim that there was an agreement on the second step of the plan. What AGNM continually promised was that when the cattle were sold (and the proceeds applied to the Cow Note to pay it off), AGNM and Borges' would sit down and talk about the remaining obligations, including of course the Facility Note.  But that was the extent of any agreement on that issue between AGNM and Ms. Borges.  Indeed, even the evidence cited in Borges Closing at 5 n.25 as evidencing their argument, in fact shows just the opposite: AGNM continually stating that once the cattle are sold, "then we will talk about other financing."

Just as clearly, a condition precedent to any alleged restructuring agreement was the sale of the cattle and payment of the Cow Note.  Id.  The last of the cows were not sold and paid for until October 2009.  Ex. E at 87 (receipt on October 6, 2009

---

made clear just how much skill, hard work and long hours running a dairy requires, especially one this size.  She did all that remarkably well, while caring for a disabled child and then a husband with increasing dementia.  (Mr. Borges died earlier this year.)  Nothing in the decisions of this Court or the outcome of this sprawling litigation should be taken as a diminished assessment of what a remarkable person, and business person, Ms. Borges is.

Case 10-01170-nlj   Doc 182   Filed 12/31/12   Entered 12/31/12 19:36:25 Page 62 of 109

of $191,874.89 from Lowell Craig for "363 hd").  Even then the
Cow Note was not paid off, due to the dispute over the CWT funds.
Then, on October 28, the foreclosure action was filed.  Thus, and
quite unfortunately, things never got to the stage where the
parties were obligated even to talk about the Facility Note.

In summary, there was no agreement to restructure the
Facility Note.  And even if there had been, the condition
precedent of the cattle sold and the Cow Note paid off was never
met.  As a result, much of Borges' argument for AGNM liability
has no factual predicate.

## 2.   Breach of Obligation of Good Faith and Fair Dealing

Borges' argue that AGNM wrongfully withheld benefit of the
Borges contracts from the Borges', and that conduct was
detrimental, it constituted a deliberate disregard of potential
harm to the Borges', and that it was without just cause or
excuse.  Borges' further argued that the conduct caused damages,
including lost sale proceeds, lost lease payments, lost operating
expense reimbursements, lost milk proceeds, lost interest income,
lost CWT payments, lost use of proceeds, lost profits, accrual of
interest, attorney fees and costs for pursuing recovery of
property from DFA, Devine and Corley (the milk checks), the
expense of an increased commission to Mr. Lewis for getting the

Page 63 of  109

herd slaughtered; and that the conduct generated potential

liability to Devine and to DFA (again, the milk checks).

The New Mexico Supreme Court has discussed, in considerable

detail, the implied covenant of good faith and fair dealing in

contract law.  Sanders v. Fedex Ground Package System, Inc.,

2008-NMSC-040, ¶¶ 7-10, 144 N.M. 449, 452, 188 P.3d 1200, 1203:

> New Mexico courts have held that every contract
> imposes a duty of good faith and fair dealing on the
> parties with respect to the performance and enforcement
> of the terms of the contract.  See Cont'l Potash, Inc.
> v. Freeport–McMoran, Inc., 115 N.M. 690, 706, 858 P.2d
> 66, 82 (1993) (citing Watson Truck & Supply Co. v.
> Males, 111 N.M. 57, 60, 801 P.2d 639, 642 (1990)).
> "The breach of this covenant requires a showing of bad
> faith or that one party wrongfully and intentionally
> used the contract to the detriment of the other party."
> Id.  The implied covenant of good faith and fair
> dealing "requires that neither party do anything that
> will injure the rights of the other to receive the
> benefit of their agreement.  Denying a party its rights
> to those benefits will breach the duty of good faith
> implicit in the contract."  Bourgeous v. Horizon
> Healthcare Corp., 117 N.M. 434, 438, 872 P.2d 852, 856
> (1994) (citation omitted).
> "The implied covenant is aimed at making effective
> the agreement's promises.  Thus, it is breached only
> when a party seeks to prevent the contract's
> performance or to withhold its benefits from the other
> party."  Azar v. Prudential Ins. Co. of Am.,
> 2003–NMCA–062, ¶ 51, 133 N.M. 669, 68 P.3d 909.
> Importantly, the implied covenant of good faith and
> fair dealing cannot be used to overcome or negate an
> express term contained within a contract.  See, e.g.,
> Cont'l Potash, Inc., 115 N.M. at 707, 858 P.2d at 83
> ("[T]he trial court erred as a matter of law in finding
> and enforcing implied covenants against the defendants
> that were inconsistent with the provisions of the
> written agreements."); Melnick v. State Farm Mut. Auto.
> Ins. Co., 106 N.M. 726, 731, 749 P.2d 1105, 1110 (1988)

("We align also with those courts that have refused to apply an implied covenant of good faith and fair dealing to override express provisions addressed by the terms of an integrated, written contract.").

Courts have recognized that "evasion of the spirit of the bargain ... and interference with or failure to cooperate in the other party's performance" constitute bad faith and may "violate the obligation of good faith in performance." Restatement (Second) of Contracts § 205 cmt. d (1981). "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party...." Id. cmt. a. As one commentator has noted, "[i]t is one function of the good-faith performance doctrine to enforce the spirit of deals, including their unspecified inner logic. Indeed, it has even been said that 'it is the potential for a lack of clarity and completeness that necessitates the implication of the good faith covenant in every contract.'" Symposium: The Restatement (Second) of Contracts, 67 Cornell L.Rev. 810, 827 (1982) (quoting Steven J. Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harv. L.Rev. 369, 380 n. 44 (1980)).

In essence, then, the implied covenant of good faith and fair dealing helps insure that both parties receive the benefit of their respective bargains. The covenant acts to protect the parties to the contract by prohibiting one party from obstructing the other party's benefit, whether that benefit is express or implied. See Bourgeous, 117 N.M. at 438, 872 P.2d at 856 ("The concept of the implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement."); Allsup's Convenience Stores, Inc. v. N. River Ins. Co., 1999-NMSC-006, ¶ 36, 127 N.M. 1, 976 P.2d 1 ("The right of Allsup's to receive a benefit of the agreement ... was injured by North River, whose duty to disclose was called for by the circumstances.").

The Sanders court also emphasized that the covenant cannot be used to override express terms in the contract. Id. ¶27, 144

N.M. at 456, 188 P.3d at 1207.  And, it stated that a court will
not apply the implied covenant of good faith and fair dealing to
add an omitted term to a contract when those terms are not
necessary to effectuate the parties' agreement.  Id. ¶29,
144 N.M. at 456, 188 P.3d at 1207.

> To establish a breach of the duty of good faith and
> causation, Plaintiffs must prove that [defendant]
> wrongfully withheld the benefit of its contract with
> Plaintiffs, to Plaintiffs' detriment, with deliberate
> disregard to the potential harm to Plaintiffs, and
> without just cause or excuse.  Paiz, 118 N.M. at
> 212-13, 880 P.2d at 309-10; see Smoot [v. Physicians
> Life Ins. Co.],[(Ct.App. 2003)] 2004-NMCA-027, ¶ 13,
> 135 N.M. 265, 87 P.3d 545 ("The implied covenant is
> breached only when [a defendant] seeks to ... withhold
> its benefits from [a plaintiff].") (internal quotation
> marks and citation omitted); Watson Truck & Supply Co.
> v. Males, 111 N.M. 57, 60, 801 P.2d 639, 642 (1990);
> Whether the implied covenant was breached is a question
> of fact that focuses on the contract and what was
> agreed to.  Gilmore v. Duderstadt, 1998-NMCA-086, ¶ 24,
> 125 N.M. 330, 961 P.2d 175.  Finally, Plaintiffs must
> establish the actual damages they sustained as a result
> of the breach.  Id. ¶ 25.

Brooks v. Norwest Corp., 2004-NMCA-134, ¶39, 136 N.M. 599, 611,
103 P.3d 39, 51.

What is relatively clear from a review of all the evidence
is that there was no breach of good faith or fair dealing.[45]

---

[45] The standard for the Bank's conduct is not what would
have been the smartest or wisest course of action, but only what
was "legal"; that is, what was permitted by the parties'
agreements represented by the notes, security agreements, etc.
and by New Mexico common law and applicable statutes (e.g., UCC
section 1-203).

First, the terms of the notes and security documents are, for the most part, quite clear. The lending and repayment arrangements – the heart of relationship between Borges' and AGNM – are reasonably explicit, including the use of the collateral proceeds to repay debt. Enforcing those requirements does not violate the covenants of good faith and fair dealing. Throughout AGNM sought to protect its own interests (and even at times had the attitude of facilitating Ms. Borges' attempts to work things out); at no time did it seek to deprive Ms. Borges of some contractual benefit, implicit or explicit, to which she was entitled.[46]

That conclusion applies as well to the somewhat confused events that lead up to and were part of the unconsummated Corley closing. What Ms. Borges' expectations were is patently clear. The fact that AGNM management appear to have resolved not to tell her or any of the other parties that AGNM would want all the net proceeds as a condition of releasing the lien on the cattle being

---

[46] It is true that there were instances in which AGNM set its lending limit on the notes somewhat lower than required, or advanced less than authorized. Compare, e.g., Ex. 124 (March 27, 2009 FCBT authorization to advance $100,000 for feed) with Ex. 125 (March 27, 2009 AGNM advance of $74,000 for feed). But there was no evidence that such actions were intended to harm the collateral (which would have been self-destructive) or to force Ms. Borges to sell the cattle more rapidly than was already being tried. Instead, the explanation appears to be that AGNM was dealing with a very large loan that was threatening to get (further) out of control so that AGNM was moving cautiously.

sold, raises serious questions about AGNM's motives.[47]  See,
e.g., Exs. 88, 93 and 94 (series of internal AGNM e-mails).  But
the bottom line is that AGNM was not at all assured of of full
payment from the collateral if it gave up as much as $1.3 million
in proceeds, and so it was perfectly within its rights to insist
on all the net proceeds of its collateral.  At no time did it
commit otherwise.  And the fact that it waited to announce or
make clear that demand, perhaps in the hope that with the closing
so imminent everyone would accede to AGNM's demand, is not a
basis for saying that AGNM was then precluded for any reason from
making the demand.  While, as noted above, the communication
could have been far better, there was no other sale opportunity
that was being lost as a result of the relative[48] tardiness with
which AGNM seems to have acted.  Whether stated earlier or later,
AGNM was entitled to insist on receipt of all the net proceeds.

    And to be clear, the Court rejects the claim that AGNM hoped
to torpedo the Corley transaction with Ms. Borges in order to
obtain the cattle, sell them for a higher price, and at the same

---

[47] In deciding this issue in favor of AGNM, the Court does
not mean to imply that the decision is an easy one.  Indeed,
there are a number of issues in this litigation in which the
positions of the parties are closely balanced.
[48] As noted, AGNM had a little over sixty hours to
investigate and react to the proposed arrangements once it
received the February 27 sale contract in the evening of Tuesday,
March 10.

time realize the full value of the real estate pledged to it, so as to recover as much as $14 million for a $9.4 million debt. That scenario is incredible if for no other reason than that AGNM and its lender FCBT were quite worried about whether the loans would be repaid in full. That was one of the reasons the loans were rated "11".[49] In fact, it was that concern that drove AGNM to insist on receiving all the net proceeds of the Corley sale.

It is worth noting that the awful financial temblor that so suddenly plunged so many people (and nations) deeply into debt caught the Borges' as well. The drastic fall in milk prices coupled with the equally drastic rise in commodity (feed) costs left a high-quality dairy incurring huge and ongoing operating losses. Ex. 38 (showing negative debt service margin of $2,561,000 for CY 2008 for the J & M Dairy).[50] Ms. Borges' plan to fix that problem failed, and she decided instead to get out of the dairy business. Id. Unfortunately, her decision came too late, at least from the perspective that she wanted to realize

---

[49] In November 2008 FCBT pressured AGNM to drop the risk rating on the Borges loans from "9A" to "11A". This was apparently done in FCBT's capacity as AGNM's lender, since it was the Farm Credit Administration that was in charge of AGNM's special supervision status. Regardless, the pressure was effective.

[50] Indeed, several other New Mexico dairies that were customers of AGNM were in similar straitened circumstances. That was at least partly why AGNM was itself struggling somewhat, and added to the urgency of collecting everything it was entitled to from the Borges'.

substantial equity from the dairy.  That left the needs of Ms.

Borges – to obtain a substantial share of the property for

herself and her family – in direct conflict with the contractual

rights of AGNM to assure itself of the maximum payment on its

loans to her.  In those circumstances, AGNM had no obligation to

look out for the welfare of Ms. Borges, or, for that matter, her

other creditors.[51]

In consequence, the counterclaim for breach of the covenants

of good faith and fair dealing will be dismissed.[52]

---

[51] It is worth noting that some of the problems that Ms.
Borges complains of were brought on by her own actions.  For
example, she desperately needed feed in the second half of March
and first three weeks of April.  But with no milk checks coming
in at that time, AGNM had little basis for advancing additional
funds.  The lack of milk checks during this five-week period was
due entirely to Ms. Borges having assigned the DFA checks to Mr.
Corley.  Ex. 123 illustrates what trouble the assignment of the
milk checks to Mr. Corley led to.  The irony of the situation
seems not to have overtly occurred to her.

[52] It is not as if, in the lead up to the closing of the
Corley deal, Debtors had available another sale or similar
transaction which they turned down in reliance on AGNM
encouraging in some way the completion the transaction with
Corley.  It is true that AGNM had been encouraging Debtors to
sell off, or start selling off, their herd, but there was no
other transaction in the offing - period.  In consequence,
whether AGNM had effectively said "no" to the Corley sale on
Tuesday, March 10, when it first saw the Corley contract, or
whether it effectively said "no" on the morning of Friday, March
13, makes no legal difference.  Could AGNM's refusal been handled
more diplomatically, or less clumsily, or could there have been
an attempt to see if some change in the numbers might have
allowed the closing to go forward, at least at some point, and
thereby realize a significant benefit for both parties?  The
answers to those three questions are almost certainly "yes".  But
while the way AGNM dealt with the matter certainly created stress

## 3. Promissory Estoppel

Under the theory of promissory estoppel, "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise." Strata Prod. Co. v. Mercury Exploration Co., 121 N.M. 622, 627, 916 P.2d 822, 827 (1996) (citing Restatement (Second) of Contracts § 90(1) (1981)).

In order to maintain a claim under the theory of promissory estoppel under New Mexico law, the movant must prove the following elements:

> (1) An actual promise must have been made which in fact induced the promisee's action or forbearance; (2) The promisee's reliance on the promise must have been reasonable; (3) The promisee's action or forbearance must have amounted to a substantial change in position; (4) The promisee's action or forbearance must have been actually foreseen or reasonably foreseeable to the promisor when making the promise; and (5) enforcement of the promise is required to prevent injustice.

Magnolia Mountain Ltd., Partnership v. Ski Rio Partners, Ltd., 139 N.M. 288, 295-296, 131 P.3d 675, 682-683 (Ct.App. 2005)

---

and anger and lasting hard feelings, nothing AGNM did was done other than to legitimately protect its property interests which were somewhat at risk to the extent that AGNM would lose $1.3 million of its collateral value. AGNM's actions were privileged from the standpoint of claims of good faith and fair dealing, promissory estoppel and prima facie tort.

Page 71 of 109

(internal citations omitted).  As long as each element is

present, the promisee need not suffer "an immediate and

identifiable economic loss."  Strata Prod. Co. v. Mercury

Exploration Co., 121 N.M. at 628, 916 P.2d at 828.

Borges relies on the same set of operative facts to support

both her UPA and promissory estoppel claims.  Borges contends

that, in reliance on AGNM's promise to restructure the facility

loan, she entered into various agreements to (1) sell her cattle,

(2) lease the dairy facility and several pieces of equipment, (3)

purchase a particular crop, and (4) pay certain debts.

As the Court previously explained, there is no evidence that

AGNM made any actual promises with regard the payoff amount or

interest rate of the facility loan.  Instead, the parties engaged

in a series of negotiations.  It is well settled that such

indefinite statements cannot serve as the basis for an "actual

promise" under the theory of promissory estoppel.  See 31 C.J.S.

Estoppel and Waiver § 117 ("[P]romissory estoppel cannot be based

on preliminary negotiations and discussions.").[53]

_____

[53] See also Magnolia Mountain Ltd., Partnership v. Ski Rio
Partners, Ltd., 139 N.M. 288, 296, 131 P.3d 675, 683(Ct.App.
2005)(rejecting a party's counterclaim based on promissory
estoppel because there was no evidence that  a lender "in fact
'promised' not to foreclose on [a] note."); 28 Am. Jur. 2d
Estoppel and Waiver § 52 (Under the theory of promissory
estoppel, the "promise must be clear and unambiguous and
sufficiently specific so that the judiciary can understand the
obligation assumed and enforce the promise according to its

The Tenth Circuit Court of Appeals has addressed the question of whether statements made during preliminary negotiations can serve as the basis for a promissory estoppel claim. In Brown v. Royal Maccabees Life Ins. Co., 137 F.3d 1236 (10th Cir. 1998), buyers of life insurance policies sued the insurer after the policies they received differed from the computer-generated illustration used to sell the policies.[54] The Tenth Circuit concluded that promissory estoppel is unavailable "where the language of a purported promise is precatory or a 'mere expression of hope' occurring in an 'obviously preliminary negotiation context.'" Id. at 1248.[55]

The Court is convinced that AGNM did not make any actual, definite promises regarding the facility loan or the proceeds of the cattle sale. As such, Borges cannot maintain a claim under the theory of promissory estoppel.

---

terms.").
    [54] The Tenth Circuit interpreted Wyoming law in Brown. However, the elements required to state a claim under the theory of promissory estoppel are essentially the same under Wyoming and New Mexico law. See Davis v. Davis, 855 P.2d 342, 347 (Wyo.1993) (A plaintiff asserting promissory estoppel must demonstrate "(1) a clear and definite agreement; (2) proof that the party urging the doctrine acted to its detriment in reasonable reliance on the agreement; and (3) a finding that the equities support the enforcement of the agreement.").
    [55] See also Triax Pacific, Inc. v. American Ins. Co., 1995 WL 643156, *7 (10th Cir. Nov. 2, 1998) (interpreting Utah law to conclude that "any promises made were part of preliminary negotiations and could not form the basis for a claim of promissory estoppel.").

In addition, promissory estoppel, while not requiring an immediate and identifiable economic loss, still requires some sort of injustice that needs to be avoided if the doctrine is to be applicable.  In this case, all the work that Ms. Borges did (some of it behind the back of AGNM, such as the assignment of the milk checks) did not give her the right to deprive AGNM of the net proceeds of its collateral.  Indeed, applying promissory estoppel here to in effect rule that AGNM had to give up $1.3 million of proceeds would cause injustice (to AGNM) rather than prevent it (to Ms. Borges).

Count three of Borges' counterclaim will therefore be dismissed.

### 4, 5 and 6.  Interference with Contract generally

New Mexico recognizes a cause of action for tortious interference with contractual relations.  <u>El Dorado Utilities, Inc. v. Eldorado Area Water and Sanitation District</u>, 2005-NMCA-036, ¶24, 137 N.M. 217, 222, 109 P.3d 305, 310.  (Citations omitted).  To establish liability for intentional interference with Contract under New Mexico law, the plaintiff has the burden of showing that (1) the defendant had knowledge of the contract between plaintiff and a third party, (2) performance of the contract was refused, (3) the defendant played an active and substantial part in causing plaintiff to lose the benefits of the

contract (4) damages flowed from the breached contract, and (5) the defendant induced the breach without justification or privilege to do so.  Bogle v. Summit Investment Co., LLC, 2005-NMCA-024, ¶20, 137 N.M. 80, 88, 107 P.3d 520, 528.  (Citing Ettenson v. Burke, 2001-NMCA-003, ¶14, 130 N.M. 67, 17 P.3d 440.) See also Deflon v. Sawyers, 2006-NMSC-025, ¶16, 139 N.M. 637, 643, 137 P.3d 577, 583.  (Same, except stating that element (2) was "Plaintiff was unable to fulfill her contract obligations".) (Citing Etteson).  The "without justification or privilege" element can be met by demonstrating that the defendant's actions were done through improper means or with an improper motive. Bogle, 2005-NMCA-024, ¶ 21, 137 N.M. at 88, 107 P.3d at 528. "Improper means" can be tortious behavior or any "predatory" behavior based on standards in a trade or profession.  Id., 137 N.M. at 89, 107 P.3d at 529.  As to "improper motive," the New Mexico courts have recognized that the alleged tortfeasor may have more than one motive for his or her actions.  See Fikes v. Furst, 2003-NMSC-033, ¶22, 134 N.M. 602, 609, 81 P.3d 545, 552 ("[T]he improper motive need not be the sole motive.") (Citing Restatement (Second) of Torts § 767 cmt. d).  If one is protecting their own legally protected interest which they believe may be impaired or destroyed by performance of the contract, they are privileged to interfere.  Id. ¶ 23 (Citing

<u>Spear v. Cimosz</u>, 97 N.M. 602, 606, 642 P.2d 205, 209 (Ct.App. 1982)).  "The inquiry, in the end, should be to determine the party's primary motivation for the interference. If it was primarily improper, then the person has no privilege. If it was primarily proper, then liability should not attach."  <u>Id.</u>, 134 N.M. at 609-10, 81 P.3d at 552-53.

The portion of the legal standard most applicable to reject Borges' argument is that "defendant induced the breach without justification or privilege to do so."  As noted already, AGNM had a very legitimate fear that giving away $1.3 million in proceeds might leave it partially unsecured.  AGNM was justified and privileged to assert its right to receive all the net sale proceeds.

### 4. Interference with Devine Farms Contract

Briefly Borges' argue that AGNM knew of the Devine contract, that the Borges' were unable to fulfill their obligations under contract because AGNM had an active and substantial part in causing them to lose the benefits of the contract, and that AGNM induced the breach without justification or privilege.  (It appears no damages are specified, but that turns out to be a moot point.)

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 76 of 109

As noted already, there was no unjustified or unprivileged action by AGNM in protecting its collateral. In consequence, Count 4 will be dismissed.

**5. Interference with CWT Contract**

The claim is that AGNM knew of the CWT contract (to put it mildly), that CWT refused to fulfil its obligations to Borges', that AGNM had an active and substantial part in causing Borges' to lose the benefit of the contract, and that AGNM induced the breach without justification or privilege. Borges' claim damages for lost interest income, the lost CWT payments, lost profits, unneeded accrual of interest, pre- and post-judgment interest and costs of suit.

To begin with, the Court has entered its memorandum opinion (doc 78) and order (doc 79) in AP 10-1170, granting partial summary judgment to Plaintiffs on the issue of who is entitled to the CWT proceeds. It withheld entering an order to have the funds delivered to AGNM, however, on the ground that the Court did not know at that time whether AGNM might have a debt to which the CWT proceeds could be applied. That issue is now being resolved in favor of AGNM.

The summary judgment establishes that the CWT funds are in fact proceeds of AGNM's collateral. Consistent with the rulings so far on similar and related causes of action, AGNM was

justified in seeking to recover and apply to the debt owed to it the proceeds of its collateral.  Therefore the Court will not only dismiss this count but also issue an order permitting the disbursement of the CWT funds in the registry of the Court to AGNM upon submission of the proper paperwork.

**6.  Interference with Lewis Contract**

In this instance, Borges' claim that AGNM knew of the contract with Mr. Lewis to get the cattle to the slaughter houses and played a substantial role in causing Mr. Lewis to (threaten to) not perform, without justification or privilege, resulting in a doubling of the commission he charged.

The Court has detailed the main circumstances of the Lewis contract.  Given the verification requirements of the CWT program, such as delivery to Virginia of thousands of eartags attached to the ears, something that is not required in the typical slaughterhouse accounting process, it is not unreasonable that the Borges' absorb this cost.  It was after all their cattle that were being transported and beefed.  It appears that AGNM's anxiety on this specific issue may have led to some clumsiness in firming up the arrangements with Mr. Lewis, and that in turn might have resulted in him charging a somewhat higher commission than he might have otherwise (say, $.50 per hundredweight instead of $1.00).  But any shifting of that extra commission over to

AGNM's side of the ledger would be based only on speculation.

And there is no basis for punishing AGNM if they were merely

being overbearing.

Count 6 will be dismissed.

**7 and 8: Conversion**

In <u>Muncey v. Eyeglass World, LLC</u>, 2012-NMCA-120, ¶ 22-23,

2012 WL 3837894 at *6-7, the New Mexico Court of Appeals

discussed the current state of the law of conversion.  It reads:

> Conversion is "the unlawful exercise of
> dominion and control over personal property
> belonging to another in exclusion or defiance
> of the owner's rights, or acts constituting
> an unauthorized and injurious use of
> another's property, or a wrongful detention
> after demand has been made." <u>Nosker [v.
> Trinity Land Co.]</u>, 107 N.M. [333] at 337-38,
> 757 P.2d [803] at 807-08; <u>see also</u> <u>Case
> Credit Corp. v. Portales Nat'l Bank</u>,
> 1998-NMSC-035, ¶ 13, 126 N.M. 89, 966 P.2d
> 1172 (Minzner, J., dissenting) (stating that
> "Nosker defined at least three different
> types of conversion, focusing on conversion
> by demand and refusal"); <u>Taylor v. McBee</u>, 78
> N.M. 503, 506, 433 P.2d 88, 91 (Ct.App. 1967)
> ("Conversion is the wrongful possession of,
> or the exercise of dominion over, a chattel
> to the exclusion or in defiance of the
> owner's right thereto; or an unauthorized and
> injurious use thereof; or the wrongful
> detention after demand therefor by the
> owner.").  We note that our Supreme Court has
> also similarly defined conversion.  <u>See</u> <u>In re
> Yalkut</u>, 2008-NMSC-009, ¶ 25, 143 N.M. 387,
> 176 P.3d 1119 (stating that, similar to a
> misappropriation of property, "conversion is
> the unlawful exercise of dominion and control
> over property belonging to another in

defiance of the owner's rights, or acts
constituting an unauthorized and injurious
use of another's property, or a wrongful
detention after demand has been made"
(alteration, internal quotation marks, and
citation omitted)).

In Frank Bond & Son, Inc. v. Reserve
Minerals Corp., 65 N.M. 257, 261, 335 P.2d
858, 861 (1959), our Supreme Court adopted
the Restatement's measure of damages for
conversion.

"Where a person is entitled to a
judgment for the conversion of a
chattel or the destruction of any
legally protected interest in land
or other thing, the damages include
... the exchange value of the
subject matter or the plaintiff's
interest therein at the time and
place of the conversion or
destruction, or a different value
where that is necessary to give
just compensation[.]"

Id. (quoting Restatement (First) of Torts §
927 (1939)); see also Cornell v. Albuquerque
Chem. Co., 92 N.M. 121, 125, 584 P.2d 168,
172 (Ct.App. 1978) (stating that, in Frank
Bond & Son, Inc., New Mexico adopted the
Restatement measure of damages for conversion
of a chattel), abrogated on other grounds by
Albuquerque Concrete Coring Co. v. Pan Am
Servs., Inc., 118 N.M. 140, 879 P.2d 772
(1994).  In Valley Chevrolet Co. v. Whitaker,
76 N.M. 488, 490, 416 P.2d 154, 155 (1966),
the Court stated that "[i]n a conversion
action, where the property has not been
returned to the owner, the measure of damages
is the value of the property at the time of
conversion with interest." Citing Valley
Chevrolet Co., in Crosby v. Basin Motor Co.,
83 N.M. 77, 79, 488 P.2d 127, 129 (Ct.App.
1971), this Court followed suit.

Page 80 of  109

In both Counts 7 and 8, Borges argues that "[t]he measure of damages for conversion is the value of the property at the time of the conversion plus interest," citing Sec. Pac. Fin. Servs. v. Signfilled Corp., 1998-NMCA-046, ¶ 15, 125 N.M. 38, 956 P.2d 837. This is often stated to be the rule of damages in a conversion case. See, e.g., Eyeglass World, 2012-NMCA-046, ¶ 39, 2012 wl 3837894 at *11 (Damages for the conversion were the value of the files at the time they were converted.) This rule of damages applies, however, only in certain circumstances.

Under New Mexico law, any person with a right to immediate possession of any goods or personalty, wrongfully taken or detained, can bring an action for replevin for the recovery of the property for damages sustained by reason of the unjust detention thereof. N.M. Stat. Ann. § 42-8-1. This person would also have an action for conversion, as discussed above. In this situation, the injured party must elect its remedies by filing either for conversion or for replevin. Signfilled Corp., 1998-NMCA-046, ¶ 16, 125 N.M. at 43-44, 956 P.2d at 842-43. See also N.M. Stat. Ann. § 42-8-7 (If the plaintiff prevails, the verdict fixes the value of the property and the damages for its detention. Then, the judgment shall be for the damages for detention "and either for the value of such property, as so fixed, or for the return thereof, at his election.") A plaintiff

cannot recover both the value and its return.  See also Valley

Chevrolet Co. v. Whitaker, 76 N.M. 488, 490, 416 P.2d 154, 155

(1966)("In a conversion action, where the property has not been

returned to the owner, the measure of damages is the value of the

property at the time of conversion with interest")(Citations

omitted; emphasis added); Martinez v. Vigil, 19 N.M. 306, 309-10,

142 P. 920, 921 (1914):

> Conversion of personal property amounts to an
> attempt, on the part of the person doing the
> act, to wrongfully transfer the title to
> himself.  The bringing of an action of trover
> amounts to an election on the part of the
> owner to ratify that which was before
> illegal, and to make it legal.  The title
> then passes completely as of the date of the
> illegal taking. Hence the rule that the
> measure of damages for conversion is the
> value of the property at the time of
> conversion, with interest. 2 Sedgwick on
> Damages (9th Ed.) § 493; 4 Sutherland on
> Damages (3d Ed.) § 1109; 13 Cyc. 170;
> Cunningham v. Sugar, 9 N. M. 105, 49 Pac.
> 910.
>
> When, however, the property is returned to
> the owner, either voluntarily, or at his
> suit, or by purchase by him, an entirely
> different principle intervenes.  In that case
> compensation to him would be measured, not by
> the value of the property attempted to be
> converted, but by the deterioration in value,
> if any, between the time of the illegal
> taking and the return to the owner, the
> reasonable value of its use, if it was of
> such a character as to be valuable for use,
> during the period of detention, costs and
> expenses in recovering the same, and perhaps
> other items in special circumstances.  In

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 82 of 109

this way the injured owner would be fully
compensated, and this is always the object of
the law.

Accord <u>NIKA Corp. v. City of Kansas City, Missouri</u>, 582

F.Supp. 343, 365 n.10 (W.D. Mo. 1983):

As defendant correctly notes, if the court
could and did order a return of the
[converted] items in question, the assessment
of damages for their value could not stand,
since defendant cannot be compelled both to
pay for the items and at the same time give
them up.  Stated shortly, plaintiff cannot
have its cake and eat it too.

(Applying Missouri law); <u>Andrus v. Hamlin (In re Hamlin)</u>,

411 B.R. 310, 314 (Bankr. W.D. La. 2009)("The damages for

tortious conversion is 'the value of the property at the time of

the conversion' when the defendant is unable to restore the

property to the rightful owner or possessor.")(Citing <u>Dual

Drilling Co. v. Mills Equipment Investments, Inc.</u>, 721 So.2d 853,

857 (La. 1998).); <u>In re Ocean Transport Corp.</u>, 213 B.R. 383, 386

(Bankr. N.D. Fla. 1997)("Since the property can not be returned,

the damages for conversion is the value of the property at the

time of the conversion.)(Citations omitted.)

In this case, the Borges' are seeking judgments for the

amounts over which AGNM "unlawfully exercised dominion and

control" and "prevented payment ... to the Borgeses, all in

defiance of the Borgeses' rights" plus interest.  However, those

amounts are being held either in the Court Registry or in an
account at AGNM for application against the Borges' debt.  In
other words, they seek to have their cake and to eat it to.[56]

The Court will enter judgment against the Borgeses on Counts
7 and 8 of their counterclaim.

**9.    New Mexico Unfair Practices Act**

Under the New Mexico Unfair Practices Act ("UPA"),
"[u]nfair or deceptive trade practices [or] unconscionable trade
practices in the conduct of any trade or commerce are unlawful."
N.M.S.A. 1978, § 57-12-3 (1971). The UPA defines the term "unfair
or deceptive trade practice" as

> an act specifically declared unlawful pursuant to the
> Unfair Practices Act, a false or misleading  oral or
> written statement, visual description or other
> representation of any kind knowingly made in connection
> with the sale, lease, rental or loan of goods or services
> ... by any person in the regular course of his trade or

---

[56] One point of contention can be summarily disposed of.
Borges' claim that AGNM tortiously settled the DFA litigation.
See Ex. 267 (agreement settling Borges v. Devine Farm 10, LLC et
al., Fifth Judicial District Court, Eddy County, State of New
Mexico No. CV-2009-227 and Ag New Mexico, FCS, PCA v. Dairy
Farmers of America, Inc., Ninth Judicial District Court, Curry
County, State of New Mexico, No. CV-2009-379).  The settlement
agreement and release seems to say that Borges' were part of that
settlement process, id. at Recital ¶ E.  In any event, given the
relatively simple facts of the cases, the settlement appears
quite reasonable.  But by far most important, none of that
litigation would have occurred but for Ms. Borges' actions in
assigning the milk checks to Mr. Corley in the manner that she
did.  Ms. Borges should not be heard to complain about a
reasonable settlement of the trouble she caused.

Page 84 of  109

commerce, which may, tends to or does deceive or mislead
any person[.]
NMSA 1978, § 57-12-2D.

In general, "the UPA is designed to provide a remedy against
misleading identification and false or deceptive advertising."
Lohman v. Daimler-Chrysler Corp., 2007-NMCA-100, ¶ 22, 142 N.M.
437, 166 P.3d 1091. The UPA provides examples of conduct that
could potentially violate the statute. See, e.g., NMSA 1978, §
57-12-2D(1)-(18) (stating that "'unfair or deceptive trade
practice' means ... and includes:"). The non-exhaustive list of
unfair trade practices includes "using exaggeration, innuendo or
ambiguity as to a material fact or failing to state a material
fact if doing so deceives or tends to deceive; [and] stating that
a transaction involves rights, remedies or obligations that it
does not involve." N.M.S.A. 1978, § 57-12-2D(14)-(15).

A movant must prove four elements in order to maintain a
claim under the UPA. Dellaira v. Farmers Ins. Exchange, 136 N.M.
552, 558, 102 P.3d 111, 117 (Ct.App. 2004). First, the movant
must show that the party charged made an "oral or written
statement, visual description or other representation" that was
either false or misleading. Stevenson v. Louis Dreyfus Corp.,
112 N.M. 97, 100, 811 P.2d 1308, 1311 (1991) (internal quotations
omitted). Second, the false or misleading representation must
have been "knowingly made in connection with the sale, lease,

Case 10-01170-nlj   Doc 182   Filed 12/31/12   Entered 12/31/12 19:36:25 Page 85 of 109

rental or loan of goods or services in the extension of credit or ... collection of debts." <u>Id.</u> Third, the conduct must have occurred in the regular course of the representer's trade or commerce. <u>Id.</u> Fourth, the representation must have been of the type that "may, tends to or does, deceive or mislead any person." <u>Id.</u>

The 'knowingly made' requirement is only met "if a party was actually aware that the statement was false or misleading when made, or in the exercise of reasonable diligence should have been aware that the statement was false or misleading." <u>Stevenson</u>, 112 N.M. at 100-101, 811 P.2d at 1311-1312. In addition, a plaintiff need not prove detrimental reliance upon the defendant's representations. <u>See</u> <u>Lohman v. Daimler-Chrysler Corp.</u>, 142 N.M. at 444, 166 P.3d at 1098; <u>Smoot v. Physicians Life Ins. Co.</u>, 135 N.M. 265, 270-71, 87 P.3d 545, 550-51 (Ct.App. 2003) (finding that the moving party "need not allege or prove that she relied on [a party's] purported deceptive conduct in order to recover under either act.").

If the movant establishes a claim under the UPA, they are entitled to damages regardless of whether they suffered actual monetary or property loss. The UPA provides:

> Any person who suffers any loss of money or property, real or personal, as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair

Case 10-01170-nlj   Doc 182   Filed 12/31/12   Entered 12/31/12 19:36:25 Page 86 of 109

Practices Act may bring an action to recover actual damages or the sum of one hundred dollars ($100), whichever is greater.

N.M.S.A. 1978, § 57-12-10(B). New Mexico courts have consistently confirmed that "in the absence of actual losses, a plaintiff is still entitled under the UPA to recover the statutory damages of one hundred dollars." Lohman v. Daimler-Chrysler Corp., 142 N.M. at 445, 166 P.3d at 1099 (internal quotations omitted). See also Page & Wirtz Constr. Co. v. Solomon, 110 N.M. 206, 211-12, 794 P.2d 349, 354-55 (1990) (stating that the claimant was entitled to recover the statutory one hundred dollars, despite his failure to produce evidence showing that the defendant's deceptive practice caused loss of money or property).

Ms. Borges argues that AGNM made several false representations in connection with a facility loan that AGNM previously made to Borges'. Ms. Borges contends that AGNM convinced her to sell her cattle by promising to: (1) reduce the interest rate on the loan; (2) accept a $6.1 million payoff to release the lien on Borges' cows; and (3) allow Borges' to use any net sales proceeds above $6.1 million. According to Ms. Borges, AGNM secretly planned to renege on all of its promises after the cows were sold. For example, she asserts that AGNM

planned to demand a payoff of $9.4 million instead of $6.1 million.

The Court is not convinced that AGNM engaged in a conspiracy to employ a "bait and switch" on Ms. Borges to force her to sell her cows. There is no evidence that AGNM made any false representations in connection with the facility loan. AGNM never promised to restructure the loan in any particular manner. The parties engaged in negotiations but never settled upon specific terms regarding prices or interest rates. Essentially, AGNM understood that Ms. Borges wanted to get out of the dairy business and agreed to negotiate further after she sold the cattle.

Assuming arguendo that AGNM made some false representations as to the facility loan, the Court nevertheless finds that they were not knowingly made. It appears that there was some confusion surrounding the negotiations regarding the facility loan. It is clear that Ms. Borges felt that AGNM agreed to certain terms pertaining to payoff amounts and interest rates. However, AGNM was not aware that any statements it made in the course of negotiations were false or misleading.

After reviewing the evidence, the Court concludes that AGNM did not knowingly make any false representations to Ms. Borges in

connection with the facility loan.  Borges' claim under the UPA

is therefore dismissed.

   **10.  Prima facie tort**

   New Mexico recognizes prima facie tort as a cause of action.

See Schmitz v. Smentowski, 109 N.M. 386, 394, 785 P.2d 726, 734

(1990):

> We ... hold today that prima facie tort is recognized in New
> Mexico.  As will be shown, it accords with our recent tort
> jurisprudence, and, if properly used, provides a remedy for
> plaintiffs who have been harmed by a defendant's intentional
> and malicious acts that fall outside of the rigid
> traditional intentional tort categories.
> Prima facie tort is not a recent innovation; its development
> has been discussed in various law reviews and decisions s
> spanning practically a century.  See Beardsley v. Kilmer,
> 236 N.Y. 80, 140 N.E. 203 (1923); Holmes, Privilege, Malice,
> and Intent, 8 Harv.L.Rev. 1 (1894); Brown, The Rise and
> Threatened Demise of the Prima Facie Tort Principle, 54
> Nw.U.L.Rev. 563 (1959) (hereinafter Brown); Forkosch, An
> Analysis of the "Prima Facie Tort" Cause of Action, 42
> Cornell L.Q. 465 (1957).
> The theory underlying prima facie tort is that a party that
> intends to cause injury to another should be liable for that
> injury, if the conduct is generally culpable and not
> justifiable under the circumstances. Restatement (Second) of
> Torts § 870 (1977).

   In recognizing this tort, the Supreme Court examined the

approaches that courts in other states had used, but rejected

them in favor of adopting the version set out in the Restatement

(Second) of Torts § 870 (1977).  Id. at 394, 785 P.2d at 734.

> Restatement (Second) of Torts § 870 (1977) has adopted a
> much more general theory of prima facie tort, providing
> that: "One who intentionally causes injury to another is s
> ubject to liability to the other for that injury, if his c

conduct is generally culpable and not justifiable under the circumstances.  This liability may be imposed although the a actor's conduct does not come within a traditional category of tort liability."
The Restatement approach embodies a balancing process, b ecause "not every intentionally caused harm ... deserves a remedy in tort." Id. comment e.  Thus, the activity complained of is balanced against its justification and the severity of the injury, weighing: (1) the injury; (2) the culpable character of the conduct; and (3) whether conduct is unjustifiable under the circumstances.  Id.  The dual nature of the determination is manifested by the requirement that the conduct be both culpable—wrongful or improper in general—and unjustifiable—under the cir
circumstances no privilege should apply.  Id.
The Restatement further breaks down the analytical process into four considerations that should be considered in balancing the above factors: "(1) the nature and seriousness of the harm to the injured party, (2) the nature and significance of the interests promoted by the actor's conduct, (3) the character of the means used by the actor and (4) the actor's motive." Id.

Id. at 394-95, 785 P.2d at 734-35.

In 2005 the New Mexico Court of Appeals analyzed a trend

that had developed in the theory of prima facie tort: that the

tort could not be used to circumvent required elements of more

traditional torts.

> To state a claim for prima facie tort, [a plaintiff] had to show (1) "[a]n intentional, lawful act by defendant;" (2) "[a]n intent to injure the plaintiff;" (3) "[i]njury to plaintiff, and" (4) "insufficient justification for the defendant's acts." Schmitz v. Smentowski, 109 N.M. 386, 393-94, 785 P.2d 726, 733-34 (1990) (citation omitted).  Prima facie tort is intended to provide a remedy for persons harmed by acts that are intentional and malicious, but otherwise lawful, which "fall outside of the

rigid traditional intentional tort
categories." <u>Martinez v. N. Rio Arriba Elec.
Coop., Inc.</u>, 2002-NMCA-083, ¶ 24, 132 N.M.
510, 51 P.3d 1164 (internal quotation marks
and citation omitted). Prima facie tort
should be used to address wrongs that
otherwise "escaped categorization," but
"should not be used to evade stringent
requirements of other established doctrines
of law." <u>Schmitz</u>, 109 N.M. at 396, 398, 785
P.2d at 736, 738.
New Mexico courts have accepted the view that
prima facie tort may be pleaded in the
alternative. <u>See id.</u> "[H]owever, if at the
close of the evidence, plaintiff's proof is
susceptible to submission under one of the
accepted categories of tort, the action
should be submitted ... on that cause and not
under prima facie tort." <u>Id.</u> at 396, 785
P.2d at 736.

    <u>Bogle v. Summit Investment Co., LLC</u>, 2005-NMCA-024, ¶ 22-23,

137 N.M. 80, 89, 107 P.3d 520, 529. That trend has continued to

today. <u>See</u> <u>Bull v. BGK Holdings, LLC</u>, ___ F.Supp.2d ___, 2012 WL

1609280 at *7 (D. N.M. 2012):

    "The value and validity of prima facie tort
as a separate cause of action depends upon
its ability to offer relief for the
intentional infliction of harm where the
actor's otherwise lawful conduct cannot be
brought within other more traditional
categories of liability." <u>Healthsource, Inc.
v. X-Ray Associates of New Mexico</u>, 138 N.M.
70, 116 P.3d 861 (N.M.App. 2005).
"Prima facie tort provides a remedy for
persons harmed by intentional and malicious
acts that are otherwise lawful, but fall
outside of the rigid traditional intentional
tort categories." <u>Negrete v. Maloof
Distributing L.L.C.</u>, 762 F.Supp.2d 1254, 1285
(D. N.M. 2007). "[T]here is simply no need

to resort to prima facie tort" when a plaintiff has "existing causes of action provid[ing] reasonable avenues to a remedy for the asserted wrongful conduct." Bogle v. Summit Investment Co., L.L.C., 137 N.M. 80, 107 P.3d 520 (N.M.App. 2005), cited in Negrete, 762 F.Supp.2d at 1286.

Before addressing the specific allegations made by the Borges' relating to this count, the Court first makes the overall observation that from the evidence presented at the trial of this matter the Court is unable to find that AGNM intended to injure the Borges'.

In recognizing prima facie tort, [the New Mexico Supreme Court] emphasized the importance of limiting the cause of action. See Schmitz v. Smentowski, 109 N.M. 386, 398, 785 P.2d 726, 738 (1990). Prima facie tort was not intended to provide a remedy for every intentionally caused harm. Id. at 394, 785 P.2d at 734. Rather, the cause of action provides a remedy for acts committed with an intent to injure the plaintiff and without justification. Id. at 395, 785 P.2d at 735. Therefore, balancing the malicious intent of the defendant against both the justifications for the injurious act offered by the defendant and the severity of the injury is a necessary step in assessing whether a prima facie tort has been committed. Id. at 394-95, 785 P.2d at 734-35. Where there is no evidence of intent to injure, there is no need to proceed with the balancing test.

Lexington Ins. Co. v. Rummel, 1997-NMSC-043, ¶ 11, 123 N.M. 774, 777, 945 P.2d 992, 995. Therefore, the Court could stop its discussion of prima facie tort at this point. However, in

addition to finding a lack of intent to injure, the Court finds
that most, if not all, actions taken by AGNM were justifiable,
justified, and generally not culpable.  Some actions taken were
specifically authorized in the written agreements between the
parties.  Some actions were imposed on AGNM by its regulatory
agency.  Some actions taken were ordinary and customary business
practices in the industry.  It is truly unfortunate that Ms.
Borges ended up in the situation in which she finds herself.
But, nothing done by AGNM caused the economy to crash or to the
price of feed to rise or the demand and price for milk to drop.
Those are the events primarily responsible for Ms. Borges'
problems.  AGNM was not a guarantor of a good economy.

    In their counterclaim, the Borges' list 16 actions or
failures to act in support of their prima facie tort claim.  The
Court has listed those actions, as well as a minimal summary[57] of
the Court's findings and conclusions on each:

| 1. | Subsequent to advising that $6.3 Million was the payoff amount required to be paid to AGNM from the proceeds from the Devine Sale, AGNM advised that the payoff amount required to be paid to AGNM from the proceeds from the Devine Sale was $9.4 Million, instead of the $6.3 Million. | True.  However, it is anything but clear that that one communication caused the $7.6 million sale (February 27 purchase agreement) to fall through. |
| --- | --- | --- |

---

[57] The more complete response to each of the allegations is
derived from reading the entire memorandum opinion.

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 93 of 109

| | | |
|---|---|---|
| 2. | AGNM contacted CWT and demanded that the CWT Payment be paid directly to AGNM, with 90% of the CWT Payment or approximately $3.6 Million to be paid immediately and with 10% of the CWT Payment or approximately $400,000 to be paid when due. | The payment terms (90% and 10% a year later) were CWT requirements. As the lienholder on the cattle with a large unpaid debt, AGNM reasonably demanded the proceeds. |
| 3. | AGNM contacted Lewis and certain slaughterhouses directly and made demands on them, including demands that payments be made directly to AGNM. | True. AGNM was the lienholder on the cattle and was entitled to assure that it received the net proceeds. |
| 4. | AGNM conditioned its agreement to make advances and made advances or payments based upon AGNM's approval of vendors and expenses to be paid. | With Cow Note amount fully committed, AGNM made further advances minimally needed to preserve the collateral. |
| 5. | AGNM conditioned its agreement to make advances and made advances or payments based upon DFA's release of milk advances. | The DFA advances ("milk checks") were overwhelmingly the primary and regular source of cash flow of the dairy and of repayment of Cow Note advances, so the lending needed to be based on the milk checks. |
| 6. | AGNM conditioned its agreement to make advances and made advances or payments based upon Borges' agreement that they would not sell cattle to raise funds for feed or expenses. | AGNM had a lien on the cattle and had the right to insist that the checks be made jointly payable to it and Borges'. |

Page 94 of 109

| | | |
|---|---|---|
| 7. | AGNM made the determination of which vendors and expenses were to be paid and in what amount and when. | With Cow Note amount fully committed, AGNM made further advances minimally needed to preserve the collateral. |
| 8. | AGNM made the determination of when and where dairy cattle should be sold. | Not true; at most AGNM merely required that Ms. Borges, after she stated that she planned to get out of the dairy business, prepare plans for the disposition of the herd, and then ensured it received the proceeds. |
| 9. | AGNM made the determination that a CWT bid should be made by Borges and in what amount. | AGNM and Borges were both interested in the CWT program, and Borges insisted on making a bid higher than AGNM recommended, which was accepted, to everyone's benefit. |
| 10. | AGNM failed or refused to make advances. | At times, it did fail or refuse to make advances, but not without justification. |

| | | |
|---|---|---|
| 11. | AGNM did not respond, either on a timely basis or at any time, to requests for advances of funds for the dairy's operations and to phone calls or other communications. | At one time or another, every party or person was not responding to communications from another party or person. However, there was no pattern or practice by AGNM to not respond to Borges'. |
| 12. | AGNM increased the interest rate on the Operating Note. | Addressed above |
| 13. | AGNM showed up on Borges' property to inspect the dairy facility or dairy cattle. | AGNM as lender had the right to inspect its collateral. |
| 14. | AGNM required Borges to resubmit documentation and information already provided. | AGNM did not require resubmissions except incidentally in the course of providing funding and monitoring its collateral. |
| 15. | Following acceptance of the CWT bid, AGNM did not reduce the fixed interest rate on the Dairy Facility Note to a lower variable rate. | True. It had no obligation to do so, and the relationship with Borges' and the loan situation had so deteriorated that it was reasonable for AGNM to not reduce the rate. |

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 96 of 109

| 16. | AGNM retained payments for application to expenses incurred by AGNM. | AGNM was entitled to retain payments for expenses it reasonably incurred in connection with the loans and the collateral. The contention is otherwise addressed above. |
|---|---|---|

Count 10 will be dismissed.

**Affirmative defenses**

Borges' assert a variety of affirmative defenses to the claims of AGNM. Many of those affirmative defenses are mirrored in Borges' counterclaims, all of which counterclaims have been addressed above. The Court need not address the mirrored affirmative defenses.

**1.   Unclean hands.**

Unclean hands is an equitable doctrine that requires that the party seeking relief (in this case, AGNM) not itself be guilty of fraudulent, illegal or inequitable conduct in the matter for which he seeks relief.  Home Savings & Loan Assoc. v. Btes, 76 N.M. 660, 661, 417 P.2d 798, 799 (1966).  Other than specified items which the Court has already addressed, such as the "Funds Held account", the unjustified interest rate increase,

Case 10-01170-nlj    Doc 182    Filed 12/31/12    Entered 12/31/12 19:36:25 Page 97 of 109

etc. (which are not so much fraudulent or inequitable as they are mere contract violations), AGNM has clean hands.[58]

**2.    Failure to mitigate damages.**

"A party may not recover as damages any cost or loss with [it] reasonably could have avoided."  UJI 13-860 NMRA.  The one instance that Borges' cite is the failure of AGNM to accept Borges' offer to it to immediately apply $3.2 million of the $3.6 million in CWT funds that were then available.  That offer was part of a larger offer made by Borges' counsel in a letter dated August 10, 2009 (Ex. 259).  AGNM could not accept the $3.2 million alone; it could only get those proceeds if it accepted the entire settlement offered by Borges'.  Clearly Mr. Arland, a master tactician[59], was using the bait of an immediate receipt of the $3.2 million as leverage for the rest of what Borges' needed, including the release of the remaining immediately available $400,000.  Had Borges' wanted the $3.2 million applied immediately, it could have released that sum without any conditions and have been assured that the funds would have been immediately applied to the debt.  And it also would have, by

---

[58] If anyone has unclean hands, it might well be Ms. Borges in connection with the unauthorized assignment of DFA payments.
[59] The Court of course applies that term to Mr. Arland only in the most complimentary fashion.  And having said that, the Court is not suggesting that his worth adversary Mr. Rowley is not also a master tactician.  Indeed, all the counsel in this case are master tacticians.

Case 10-01170-nlj   Doc 182   Filed 12/31/12   Entered 12/31/12 19:36:25 Page 98 of 109

doing so, probably avoided the filing of the foreclosure action. See Ex. 175 (July 2009 loan status reports noting that Borges' had been given a deadline of August 12, 2009 to agree to the release of the CWT funds; otherwise a foreclosure action will be filed).[60] This affirmative defense will be denied.

### 3. Waiver and estoppel

The claim is that AGNM's actions led Borges' to believe that it would not foreclose on the collateral. The defense requires that Borges' have an "honest and reasonable belief" that AGNM intended to waive its right to foreclose, J.R. Hale Contracting Co., Inc. v. United New Mexico Bank at Albuquerque, 110 N.M. 712, 717, 799 P.2d 581, 586 (1990), or that AGNM could reasonably expect that its actions would induce Borges' reliance. Id. The Borges' cannot reasonably have expected that as matters between them and AGNM deteriorated, AGNM would never drop the hammer of foreclosure. It is true that AGNM extended the Cow Note several times and made a number of optional advances, but those actions were taken in large part to protect the collateral (suggesting as a result that AGNM was not in effect promising to not take collection action such as a foreclosure). And to the extent that AGNM sought to make things work for the Borges', AGNM should not

---

[60] The issue here of course is not whether the proposed settlement agreement tendered by Mr. Arland was reasonable; that is another issue, which the Court does not address.

Page 99 of 109

be punished for that approach or attitude by upholding this affirmative defense against it.  This affirmative defense will be denied.

### 4.   Breach of the obligation of good faith and fair dealing

This has already been addressed as a counterclaim.  It is denied.

### 5.   Breach of contracts and agreements

While the Court has found that AGNM violated some contractual provisions, none of the violations rise to the level of seriousness that would constitute a breach so material that it constituted a basis for Borges' to repudiate the contracts (the notes).  In fact, the initial lending on all three notes and then the continued lending on the Line of Credit Note were the major obligation required of AGNM which it performed at the outset and continually thereafter.  The affirmative defense is denied, except as specifically set out above in connection with claims asserted by Borges'.

### 6.  Duress

The standard for duress is usefully set out in UJI 18-838: "Duress is intentional action by one person presenting such a serious business or financial loss or injury to the other person to the contract that [she, as properly substituted by borges' counsel] has no reasonable choice or alternative."  Ms. Borges

asserts she was coerced (or hoodwinked) into a higher interest rate for the Cow Note.  Whether that is the case in these circumstances turns out to be moot, since the Court has already determined on other grounds that the interest rate was improperly raised to 6.01% on the Cow Note, and must be reduced to 3.55%. The affirmative defense is denied as moot.

### 8 [sic].  Offset

The Court agrees that from a practical point of view, the judgment and orders to be entered will in effect net out the claims and defenses of the parties.

### 10 [sic]. Improper settlement with DFA

Borges' assert that the settlement of the DFA litigation caused them to lose their claim against DFA for $65,000.  The Court has already addressed the issue above.  But in addition, to the extent that Ms. Borges is now precluded from further pursuing the claim (assuming she did not voluntarily settle it earlier as is suggested by the settlement agreement) because she is a member of DFA and thus bound by the settlement agreement and release, Ex. 267, then there is a serious question about whether she had any right to take any action independent of DFA to begin with. This affirmative defense is denied.

### 11. Promissory estoppel.

The Court addressed promissory estoppel as one of the counterclaims (no. 3). This affirmative defense is denied.

**Borges' claims in Adv. Pro. 11- 1012**

Ms. Borges argues persuasively that the "Corrected Mortgage" was not effective in 2009 to allow AGNM to escape the reach of the Debtor's strong arm powers. As noted above, the Court agrees.

She also argues that the CWT funds are also to be freed from the claims of the Debtor. In part, the Court agrees with her, in the sense that ACA and FLCA are not parties with perfected interests in the CWT funds. But the same partial summary judgment that made that determination also determined that the perfected party is PCA, and that the only issue remaining with respect to the CWT funds being delivered to PCA is whether AGNM is owed an amount in excess of the CWT funds. This memorandum opinion is such a determination.

On the other hand, the Court has also ruled that the Funds Held account must be applied to the Cow Note as if the receipts (and expenditures) were applied on the date that AGNM's records (Ex. E) show they were received or expended. In effect, those funds will be offset against the Cow Note as requested by Ms. Borges in affirmative defense no. 8.

The water rights issue is one that admits of more complexity.

### Avoidance of the interest in water rights

Borges contends that, as the debtor in possession, she is entitled to avoid the AGNM's claimed lien and ownership interest in certain water rights pursuant to 11 U.S.C. § 544(a). AGNM asserts that Borges cannot avoid AGNM's interest because it was properly perfected under New Mexico law.

As the Court previously explained, Section 544(a) allows a bankruptcy trustee or debtor in possession to use their so-called "strong arm powers" to avoid certain transfers of real property by the debtor. Section 544(a)(1) allows the trustee or debtor in possession "to avoid any transfer or obligation that a hypothetical creditor with an unsatisfied judicial lien on the debtor's property could avoid under relevant state nonbankruptcy law." In re Haberman, 516, F.3d 1207, 1210 (10th Cir. 2008). Similarly, Section 544(a)(3) allows the trustee or debtor in possession to avoid a mortgage or lien if it could be avoided by a hypothetical bona fide purchaser of the property.

Under Section 544(a), a debtor in possession, "in the exercise of his or her strong-arm powers, may avoid a security interest in the debtor's property that was not perfected prior to the petition date." 9B Am. Jur. 2d Bankruptcy § 2016. See also

In re Harper, 516 F.3d 1180 (10th Cir. 2008) ("Under § 544(a)(1),
the trustee has the status of a hypothetical lien creditor once
the bankruptcy petition is filed, and may avoid security
interests that are unperfected under applicable law."); In re
Haberman, 516 F.3d at 1213 (noting that the trustee was entitled
to avoid an unperfected lien under Section 544(a).  Thus, to
determine whether Borges may avoid the transfer under Section
544(a), the Court must determine whether the assignment of water
rights was properly perfected under New Mexico law.

Pursuant to N.M.S.A. 1978 § 75-5-22 (1953), "no assignment
[of water rights] shall be binding, except upon the parties
thereto, unless filed for record in the office of the state
engineer."  To properly file and perfect such an assignment, the
transferee must meet the following requirements:

> [1] [T]he new owner of the water right shall file a
> change of ownership form with the state engineer[;]
> [2] "The form shall include all information conforming
> with water rights of record filed with the state
> engineer and shall be accompanied by a copy of a
> warranty deed or other instrument of conveyance[; and]
> [3] The new owner shall record a copy of the change of
> ownership form filed with the state engineer with the
> clerk of the county in which the water right will be
> located.

N.M.S.A. § 75-2-2.1 (1996).

Borges contends that AGNM has not satisfied the requirements
of Section 75-2-2.1.  The Court agrees.  First, the change of

ownership forms were filed on behalf of ACA instead of AGNM. AGNM contends that the forms were properly filed notwithstanding the fact that they listed an incorrect name – ACA instead of AGNM. As the Court previously explained, a transfer of property must be properly acknowledged by the correct parties in order to be classified as recorded for the purposes of 11 U.S.C. § 544(a). See Jesko v. Bank of America, NA (In re Jesko), Adv. No. 04-1166 (Bankr. D. N.M. 2006) (finding that an instrument acknowledged by the incorrect parties was not recorded and could be avoided under Section 544(a)). In addition, the change of ownership forms were not accompanied by a copy of a deed or other instrument of conveyance. The parties failed to attached the 2006 Mortgage, the Corrected Mortgage, or any other instrument to the forms before filing them.

The Court finds AGNM failed to fulfill the requirements of N.M.S.A. § 75-2-2.1. The change of ownership forms were not properly recorded, and as a result, AGNM's interest in the water rights was never perfected. Borges is therefore entitled to avoid the assignment of water rights under 11 U.S.C. § 544(a).

**Remand**

Section 1452(b) of title 28 of the United States Code provides that "[t]he court to which such claim or cause of action is removed may remand such claim or cause of action on any

equitable ground." This subsection grants very "broad discretion" to the bankruptcy court to remand a proceeding back to the state court from which it has been removed or to deny the remand request. 1 Collier on Bankruptcy ¶ 3.07[5], at 3–79 (15th ed. rev.2008). See also In re C and M Properties, L.L.C., 563 F.3d 1156, 1160 (10th Cir. 2009) (noting that once a proceeding is removed to bankruptcy court, the Court may remand it to state court on "any equitable ground.").

The Court has mostly resolved the debt and collateral issues surrounding the foreclosure action. The foreclosure action and any remaining viable counterclaims are governed by state law and are not core proceedings. See In re Phoenix Environmental, LLC, 2012 WL 4739941, *1 (Bankr.D.N.M. Oct. 3, 2012) (J. Starzynski) (finding that foreclosure action and countclaims related to deceptive trade practices, slander, and quiet title were non-core proceedings under Stern v. Marshall). Moreover, state courts have "more experience and expertise in handling foreclosures" because they "handle[] literally thousands of mortgage foreclosure proceedings." In re Abruzzo, 1999 WL 1271261, * 3 (Bankr.E.D.Pa. Dec. 28, 1999).

The Court is therefore convinced that the case should be remanded to state court so that the proper state authorities may

conduct the foreclosure sale.  The Court will enter an order
accordingly.

**Miscellaneous**

AGNM claims that Borges family members either converted or
permitted to be converted personal property at the dairy or in
the attached farmland that was collateral of AGNM.  The lost
property included such things as irrigation equipment,
refrigeration units and copper tubing (items of immediate and
significant value).  AGNM further claims that members of the
Borges family knew about the conversion – more accurately, theft
– but did not report it to anyone in time for an insurance claim
to be filed.

The Court has reviewed the evidence, including Ex. LL
(the Incident Report, in the limited capacity for which it was
admitted), and finds that the evidence that (1) one or more of
the Borges' took the property, (2) none of the Borges' took the
property but knew about the conversion in time to allow the
filing of an insurance claim but did not, or (3) both, is not
sufficient to render a judgment against any family member.  By
reaching this conclusion, the Court does not mean to downplay the
seriousness of the allegation nor of the considerable value of
AGNM's loss.  It is just that, through no fault of AGNM's,

sufficient proof to identify who took the property appears not to exist.

### Conclusion

For the reasons stated, the Court finds that it should award a judgment against Ms. Borges (only in her capacity as debtor in possession), as set out in orders adjudicating the objections to the proofs of claim (main case, claim nos. 15, 16 and 17 and docs 115, 116 and 117) and further orders that (1) AGNM may foreclose on all of the dairy facility and the adjacent farmland, except for the 220 acres, (2) AGNM may not foreclose on the water rights, (3) the liens on the 220 acres and the water rights are avoided and preserved for the estate, (4) AGNM (specifically PCA) is entitled to an order (prepared by its counsel in consultation with the Court Clerk's office) delivering to it the remainder of the funds in registry of the Court representing the CWT funds, (5) denying the counterclaims of Borges' except as incorporated as offsets as explained in this memorandum opinion, and (6) severing from Adv. Pro. 11-1012 and remanding Adv. Pro. 10-1170 – the Removed Action – back to the Fifth Judicial District Court for further foreclosure proceedings.



Honorable James S. Starzynski
United States Bankruptcy Judge

Date Entered on Docket: December 31, 2012

Copies to:

Bonnie Bassan Gandarilla
Moore, Berkson & Gandarilla, P.C.
PO Box 7459
Albuquerque, NM 87194

George M Moore
Moore, Berkson & Gandarilla, P.C.
PO Box 7459
Albuquerque, NM 87194

Linda S Bloom
PO Box 218
Albuquerque, NM 87103-0218

Richard F Rowley, II
Rowley Law Firm, P.C.
PO Box 790
305 Pile
Clovis, NM 88102-0790

Karla K Poe
201 Third Street NW, Suite 505
Albuquerque, NM 87102

William J Arland, III
PO Box 1089
Santa Fe, NM 87504-1357